ROBERT W. BUSKIRK, *an Infant, v.* BANKERS FINANCE CORPORATION

(No. 8898)

Submitted May 3, 1939. Decided June 13, 1939.

*Hogg & Crawford,* for appellant.
*Paul W. Scott* and *Bias & Bias,* for appellee.

Fox, PRESIDENT:

On the 4th day of August, 1938, the circuit court of Cabell County entered a decree in favor of Robert W. Buskirk, Jr. against the Bankers Finance Corporation for $12,099.60, in an equity suit pending in said court, from which decree the defendant prosecutes this appeal.

Robert W. Buskirk, Jr., was born on the 15th day of June, 1918, and, being an infant, prosecutes this suit by his next friend. Shortly after his birth, Ruby L. Buskirk, his mother, qualified as his guardian, and except for about two years, from 1927 to 1929, has continued as such. In 1924 she invested $10,000.00 of the estate of her ward in the purchase of one hundred shares, of the par value of $100.00 per share, of preferred stock of the Bankers Finance Corporation, on which dividends of eight per centum per annum, payable quarterly, were stipulated to be paid. In 1927 the Finance Corporation retired three thousand shares of its preferred stock under a resolution providing that each holder of such stock should have op-

portunity to exchange a proportionate part of his stock for the notes of the Finance Corporation, bearing six per cent interest, and payable in five equal annual payments. The claim of the plaintiff is that his guardian was not given an opportunity to make this exchange; that she was, under the circumstances hereafter set out, entitled to exchange seventy-two shares of said stock, of the par value of $7200.00, and that he is now entitled to recover that value with interest from April 1, 1927, the date when the exchange was required to be made. The trial court sustained his claim.

The Bankers Finance Corporation was organized in 1921 by a group of business and professional men residing in and near the City of Williamson. It was financed by the sale of its eight per cent preferred stock, and the sale of common stock in connection therewith. The purchase of two shares of the preferred stock at the par value of $100.00 per share entitled the purchaser to acquire and purchase one share of the common no-par stock at a price of $5.00 per share. The voting power was vested solely in the common stock. On February 10, 1927, the date when the resolution providing for the retirement of a part of the preferred stock was adopted, there had been sold 5695 shares of this stock of the par value of $569,-500.00, and the stock was held by many of the conservative business men of that section of the state.

The business of the corporation prospered from the beginning, and its stock held a high place as a sound and safe investment among those who were in a position to gauge its value. In May, 1923, its office was removed to Huntington, West Virginia, where it still remains. The corporation paid dividends on its preferred stock up to June 30, 1928, after which, by reason of local reduction of real estate values in the territory in which it did business, and the general business depression which followed, it has been unable to pay dividends, and it is admitted that the outstanding preferred stock is not now, and will never be, worth its par value. Early in 1927, in order to bring about a reduction in its taxes, and, so far as the

record discloses, for no other reason, it was decided to retire 3,000 shares of the preferred stock of the corporation and pay for the stock surrendered for retirement by giving notes of the corporation to be paid over a period of five years, in equal amounts each year, said notes to bear interest at the rate of six per cent per annum. On February 10, 1927, a resolution was adopted by the holders of the common stock putting this plan into effect, in which it was provided "that each stockholder of this corporation be given an opportunity to sell his Preferred Stock to the corporation in the proportion that his holdings of said Preferred Stock bears to the aggregate amount of said stock heretofore sold and now outstanding." Under this resolution, had all stockholders exchanged their preferred stock for notes, each would have been entitled to so exchange fifty-two per cent of his stock, and under another provision of the resolution, this percentage would be increased proportionately by the waiver by other stockholders of their right to make the exchange. It is admitted that about one-fourth of the total preferred stock outstanding was not exchanged, and by reason of this fact the stockholders who elected to exercise their rights under the resolution were entitled to exchange seventy-two per cent of their stock. After the adoption of this resolution the corporation attempted to notify all holders of the preferred stock of the opportunity to exchange their stock for its notes, and this brings us to the sole question involved in this litigation: Was Ruby L. Buskirk, as guardian for Robert W. Buskirk, Jr., "given an opportunity" to sell any of the preferred stock held by her under the terms of the resolution mentioned above?

When Ruby L. Buskirk was appointed guardian for the plaintiff herein, she procured a surety company to sign her bond as such, under an agreement by which the surety company could exercise joint control with her over the funds of the estate. In 1924 the purchase of the preferred stock of the Finance Corporation was suggested to her by her then counsel, who was at that time a stockholder, both common and preferred, in the Finance Cor-

poration, and its general counsel. It is clear, however, that he did not urge the purchase of the stock; that he advised against the purchase of the common stock; and that he advised the guardian to consult well known and reputable bankers and business men as to the preferred stock. Her contract with the surety company required that she consult it, and this she did by taking up the matter with its local representative. It seems to have been agreed that the dividends on the stock purchased should be deposited to the credit of the guardian in the National Bank of Commerce of Williamson, and this was done so long as dividends were paid, and the stock certificate was, apparently, filed with this bank for safekeeping. In January, 1925, Mrs. Buskirk married A. B. Gillam, and from that time until 1928, when she obtained a divorce, she is referred to in the record as Ruby L. Gillam. The record of the Finance Corporation with respect to its preferred stockholders carried the name Ruby L. Buskirk, Guardian, and a notation that dividend checks were to be sent to the National Bank of Commerce, Williamson, West Virginia, and dividends and statements of the condition of the corporation were from time to time, as dividends became payable and statements issued, sent to that address, although Mrs. Buskirk says statements as to the business of the Corporation were sent to her address in Huntington during the time she lived there, and to Matewan when she removed to that town. Be this as it may, the Finance Corporation, on February 15, 1927, prepared and forwarded to its preferred stockholders, by registered mail, a copy of the resolution of February 10, 1927, a letter explaining the same and a form for reply on which the stockholder could indicate what he desired to do with respect to the sale and exchange of his stock. Such a communication was so forwarded to Ruby L. Gillam, Guardian, Care National Bank of Commerce, Williamson, W. Va., was received by an employee of that bank on February 21, 1937, as shown by the return receipt for the registered letter, and delivered to the officials in charge thereof. There is no dispute on this point, and if Ruby L. Gillam ever received these papers, she received them

through the National Bank of Commerce. No one connected with the bank has any independent recollection as to what was done with the papers intended for the guardian, and we must decide the question at issue on statements of witnesses as to what occurred subsequent to the date when the papers reached the bank, and the circumstances connected with the conduct of the interested parties after that date.

Ruby L. Buskirk expressly denies that she ever received the copy of the resolution, the letter, and form of reply sent by the Finance Corporation to her in care of the National Bank of Commerce, from the bank, or otherwise; and she also denies that she had opportunity to sell and exchange any of the preferred stock in question, held by her as guardian; or that she ever knew that such sale and exchange could have been made until early in 1931, when, in a conversation about money matters with her son-in-law, Dan Chambers, then cashier of a bank at Matewan, he asked her why she had not exchanged her stock for notes as another stockholder, Hugh Boyd, had done. This, she most positively testifies, was the first information she received on the subject. Dan Chambers testifies as to this conversation and corroborates Mrs. Buskirk, and says she then told him "she didn't know anything about it." Eppie Sydnor, a sister of Mrs. Buskirk, says that in the spring of 1931, Mrs. Buskirk said to her, "Eppie what do you think—the Bankers Finance failed to let me know they are buying in all the stock at a certain price and giving notes for the remainder of it", and that she had learned of this through Dan Chambers. A daughter, Mildred Buskirk, also testified, but her statements go no further than that she lived with her mother in February of 1927, and was well informed of her financial affairs generally, but heard nothing of any proposed sale or exchange of the stock of the Finance Corporation, which she says she knew her mother held. The defendants, admitting, as they must, the materiality and importance of the testimony of Mrs. Buskirk, say that the testimony of Dan Chambers and Eppie Sydnor as to what Mrs. Buskirk told them adds nothing to, and is but a re-

affirmation of her own statement that she had not received notice of the proposed exchange of stock for notes, and knew nothing about it; and they say that this contention rests solely upon her own statement, and is in no wise strengthened or supported by its repetition to others. We think it must be held that this is a correct position, and certainly her statements can go no further than as showing a state of mind, and if they be considered for that purpose, it becomes important to inquire as to her subsequent actions bearing upon the matter as to which her statements relate.

In April, 1931, after her conversations with Dan Chambers and Eppie Sydnor, Mrs. Buskirk went to Huntington and had a conversation with the secretary of the Bankers Finance Corporation in regard to her preferred stock. From her own testimony, we learn that when she inquired of the secretary why she was not getting money on her stock as others were, she was told, "Well you should have sold when you had your chance, we sent out registered letters to you", and she asked "What registered letters * * * ?", and was told: "At the time when you could sell your stock and get a certain amount of cash and a certain amount of notes and we sent out registered letter to that effect". When she asked who receipted for her letter, the secretary was not able to open the safe in which the receipts were kept, but wrote her a few days later that Louise Cox, a stenographer at the National Bank of Commerce, had signed the receipt for her letter. She did not at that time make any claim that she had not received notice of opportunity to exchange her stock. Later in the same year, probably about June, she again saw the secretary of the corporation, and proposed to him that she would take "a house" for her stock, and was told this could not be done, and in this conversation, no claim was made that she had not received notice of opportunity to exchange her stock in the spring of 1927. At some time, after her first conversation with the secretary, she talked with the president of the corporation along the same line. Then in 1932, according to her testimony, she had a con-

versation in Huntington with her former counsel, who had first suggested the purchase of the stock, and discussed her situation with him, and was told, in effect, that nothing could be done, but it is denied that this conversation occurred. In 1934, she communicated by letter with this gentleman in an effort to enlist his support in obtaining a bank loan in Huntington. From 1931 to the date of the institution of this suit, she discussed her situation with respect to this stock with other parties, some of them stockholders, but to none of them did she make the claim of lack of notice set up in the bill and to which she has testified. About 1933, she employed Randolph Bias, of counsel in this suit, and in 1936 asked him to represent her in a meeting of common stockholders to be held in Huntington, at which, as it developed, a proposal was made to sell the assets of the Finance Corporation to a new corporation, under such terms and conditions as would save to the preferred stockholders their preferential standing, but reduce the shares of stock to correspond with the value of the assets sold, to which proposal Mr. Bias objected, and for some reason the same was abandoned. Up to the time of this meeting, Mrs. Buskirk had not advised her counsel, who had been employed as such for three years, that she had not received notice of opportunity to exchange her stock in 1927, and it was not until after the return of Mr. Bias to Williamson that, in a conversation in which the Huntington Meeting was discussed, for the first time she told him that she had not received notice. The only conflict of evidence as to these various conversations arises out of the statement of Mrs. Buskirk that she advised the general counsel of the Finance Corporation, her former counsel, in 1932, that she had not received notice, her statement being, "I told him I knew nothing of it."

We now come to the evidence introduced by the defendants in an attempt to show that plaintiff's guardian was furnished the opportunity to sell and exchange her stock in accordance with the resolution of February 10, 1927. In the year 1927, Ruby L. Buskirk, then Mrs. Gillam,

lived with her husband at Matewan. Gillam, who now lives in North Carolina, testified that he discussed with his wife, in the early part of the calendar year of 1927, the matter of the exchange of preferred stock in the Bankers Finance Corporation, and that the proposition was to exchange stock earning eight per cent for notes bearing interest at the rate of six per cent, and that the information he had came from his wife. He says he thinks it was decided to talk over the matter with Mr. Early of the National Bank of Commerce, and that he thinks he and his wife went to Williamson and talked with Mr. Early. He states positively that he saw a letter from the Bankers Finance Corporation bearing on the matter of the exchange of the stock, and when shown a copy of the letter which was sent by the Finance Corporation to its preferred stockholders relating to the exchange of stock, and asked if he had seen this letter, said, "I don't know that this is the exact letter that I saw but I could say that some of the things in this letter I have seen, and that is about exchange of stock for notes." Carl B. Early, who in 1927 was cashier of the National Bank of Commerce, testifies that in that year, and before the date when the time for the exchange of preferred stock of the Finance Corporation for its notes had expired, he talked with plaintiff's guardian and her then husband about the exchange of her stock, in his office in the bank. He, himself, held a large block of preferred stock in the Finance Corporation and received notice of his opportunity to exchange stock by registered letter on the same day the notice intended for the guardian was received by the bank. He qualifies his statement by basing it on his recollection, and on cross-examination admits that his recollection may be faulty, and states that he thinks his statement correct, but is not certain; and then on redirect examination, when asked if there was any doubt in his mind as to the conversation he had with the then Mr. and Mrs. Gillam, said, "I don't have any doubt about it." The statements of Gillam and Early impress us as those of cautious witnesses, seemingly desirous of not making

an over-statement. They are, in a measure, corroborated by the testimony of Joseph B. Smith, then connected with the bank, who says he frequently saw Mr. and Mrs. Gillam in the bank during the year 1927, and for about a year prior to November, 1927, and that they consulted Mr. Early, although he does not undertake to say what subjects were discussed between them.

Having attempted to fairly present the contentions of the parties, and the evidence bearing thereon, it seems appropriate at this point to discuss the situation with respect to the Finance Corporation, its preferred stock, and the position of the plaintiff's guardian in regard thereto at the time provision was made for the exchange of said stock for the notes of the corporation. In the first place, it should be stated that there is no contention made that there was any illegality connected with the original purchase of the stock, or that the plaintiff, by reason of the fact that his estate was handled by his guardian, may invoke a different rule of equity than that applying to a transaction between adults in their individual status, unless it be on the question of laches. At the time of the resolution providing for the exchange of stock for notes, there seemed to be no doubt of the ability of the Finance Corporation to pay the stipulated dividend on its preferred stock and the investment was regarded as a safe one by those well qualified to judge. At that time the plaintiff was a few months under nine years of age, and, so far as he was concerned, there was no pressing need for the conversion of his estate into cash. The stock seemed to assure an annual return of eight per cent, whereas, the notes offered in exchange would reduce the income yield to six per cent. The holders of about one-fourth of the preferred stock outstanding elected to hold their stock and did not make the exchange, and, so far as the record discloses, there did not seem any good reason why the plaintiff's guardian should have made the exchange. All this is said in support of the theory that, if the guardian had notice and opportunity to exchange, she might reasonably have elected not to do so, and this notwithstand-

ing her statement made years later, when the wisdom of the exchange is apparent to all, that she would have made it.

It is needless to dwell upon the financial catastrophe which engulfed the land from 1929 to 1931. Before this, in 1928, the Finance Corporation found it necessary to suspend payment of dividends on its preferred stock, and by 1931, it must have been apparent that they would never be resumed, and that the face value of the stock itself had been seriously impaired. The anxiety and distress of Mrs. Buskirk can be well understood, and when Chambers asked her why she had not exchanged her stock, she professed not to have known that she could have done so, and repeated this statement to her sister a short time later. The motive to cover up her mistake of judgment, if such there was, was present. But she did nothing more. Unless she told the general counsel of the Finance Corporation early in 1932 that she had not known of this opportunity, and on this there is conflict of evidence, she waited some five years before she ever mentioned to anyone, even counsel she employed in 1933, the claim now asserted that she was not given an opportunity to exchange her stock. These facts alone argue strongly against the validity of her present claim, and when to them is added the testimony of two witnesses who say she discussed with them the matter of the exchange, we are impelled to the conclusion that Mrs. Buskirk did know that she could exchange her stock, in part, for notes, and that for reasons then deemed sufficient, failed to do so. Of course, having failed to avail herself of the opportunity to exchange then presented, she and her ward are now bound by her dicision. It follows that the decree of the trial court was erroneous.

The conclusion we have reached does not rest on the delivery of the papers intended for the guardian to the National Bank of Commerce. We do not think the sending of these papers to the bank was in itself notice to the guardian. The record does not sustain the contention made that notices in connection with the stock held by

the guardian could, under some character of understanding with her, be forwarded to the bank, and whatever understanding there was did not extend beyond the deposit of dividends with said bank. But, notwithstanding reference in the brief of counsel for the appellee to the alleged requirement of "notice" in the resolution of February 10, 1927, that resolution does not require any particular notice. What was required is that each stockholder "be given an opportunity to sell", and while opportunity implies notice of some character, it does not, necessarily, mean the written notice which was attempted to be given through the medium of the National Bank of Commerce, but could have been afforded by any means by which the guardian could have been made acquainted with her right to exchange her stock. The evidence and circumstances do not show the probability of her having received information with respect to such right by any means other than through the papers sent to the bank, but we think she received this information in some manner, and that the exact method employed is unimportant.

We are not unmindful of the rule prevailing in this jurisdiction that the decree of a trial court will not be reversed unless plainly erroneous. Ordinarily in a case of conflicting evidence and circumstances the decree of the trial chancellor will not be disturbed. We think the rule is more strictly enforced where the action of the trial court is based on the verdict of a jury. In equity cases this court has not hesitated to reverse decrees rendered on conflicting evidence, where the evidence of the appellant appeared to plainly preponderate, or the trial chancellor misconceived the force of the evidence and circumstances relied upon for reversal. *Hendrick* v. *Jenkins,* 104 W. Va. 486, 140 S. E. 483; *Blue* v. *Hazel Atlas Glass Co.,* 106 W. Va. 642, 147 S. E. 22; *Meyers* v. *Washington Heights Land Co.,* 107 W. Va. 632, 633, 149 S. E. 819; *Jones* v. *Hoard,* 108 W. Va. 308, 151 S. E. 183; *Harner* v. *Harner,* 115 W. Va. 457, 177 S. E. 286; *Tynes* v. *Shore,* 117 W. Va. 355, 185 S. E. 845. We do not say that the decree in this cause is without evidence to support it, but we are of the opinion that

the evidence, circumstances, and acts of the parties strongly preponderate in favor of the defendant and present a case wherein we are justified in setting aside the decree appealed from.

The decree of the circuit court of Cabell County is reversed, and the plaintiff's bill dismissed.

*Reversed; bill dismissed.*