MAE SULLIVAN STRATON, *Admx., etc., v.* J. E. ALDRIDGE, *et als.*

(No. 8959)

Submitted October 24, 1939. Decided December 12, 1939.

*Goodykoontz & Slaven* and *Fred Kopp,* for appellant.
*Hogsett & Smith,* for appellees.

FOX, PRESIDENT:

The plaintiff, Mae Sullivan Straton, as administratrix of the estate of Joseph Butcher Straton, deceased, instituted her suit in the Circuit Court of Cabell County against the defendant, J. E. Aldridge, seeking a decree that she be adjudged the owner of three hundred seventy-five shares of the capital stock of the Big Huff Coal Company, a corporation, subject to the payment of certain sums of money admittedly due J. E. Aldridge arising therefrom, and asking that the certificate issued to said Aldridge for said stock be cancelled and a new certificate issued to her, and for general relief.

The bill is based upon the theory that the defendant Aldridge held the said stock under a trust relationship existing between him and its former owner, Joseph Butcher Straton. Upon bill, answer and proof taken before the court, a decree was rendered on the 17th day of February, 1939, in favor of the defendant Aldridge, and plaintiff's bill dismissed, the court finding in its decree that the evidence failed to show an express trust between plaintiff's decedent, or the plaintiff in her own right, and the defendant as to the stock in controversy. From this decree plaintiff appeals.

. About the 15th of December, 1930, Joseph Butcher Straton borrowed of the First Huntington National Bank the sum of $1500.00, and gave his note therefor with J. E. Aldridge as endorser. He deposited with said note as collateral security therefor three hundred seventy-five

shares of the capital stock of the Big Huff Coal Company, a corporation. On February 17, 1931, a payment of $100.00 was made on the note and a renewal for the balance, and there was also a renewal on May 18th. On August 16, 1931, the note not being paid at its then maturity, the bank advertised a sale of the collateral aforesaid for the 31st of August. On that day, Straton came to Huntington from his home at Williamson, and he, together with Aldridge, went to the bank and secured a further renewal of the said obligation, Aldridge stating at the time that if the note should not be met at maturity, he would pay the same. The note matured on November 14, 1931, was not paid, and the bank again advertised the collateral for sale to be made on December 1st, following, and both Straton and Aldridge were given notice thereof. On November 30th, the day before the proposed sale, Straton wrote a letter to Aldridge at Huntington, West Virginia, in the words and figures following:

"Mr. J. E. Aldridge,
Huntington, West Virginia.

Dear Ed:

I would appreciate it very much if you would take up my stock and hold it for me as I am trying now to make a sale of a tract of land which I own in Mingo County, and I believe that I will be successful in doing so. We are waiting now to get a reply from the company which has the purchase under consideration.

I have insisted upon sale of this land here in the County and we have made the company a price of $16,000. This same tract of land sold a few years ago for $40,000.

I am sure you can handle this for me without any trouble and I will take care of it just as soon as I can.

Very truly yours,
J. B. Straton."

Aldridge states that this letter was received by him, but he does not recall whether it was before or after the sale of the stock mentioned therein. In regular course of mails

he should have received it on the morning of December 1st. No reply was made to the letter, nor did any character of communication pass between Aldridge and Straton thereafter. On December 1, 1931, the shares of stock above mentioned were sold, immediately after banking hours, by an assistant cashier of the bank, and purchased by Aldridge for the sum of $375.00. On the day following, Aldridge paid to the bank the sum of $1409.51, covering the price paid for the stock and the balance due on the $1400.00 note and some expenses connected with the sale. On the 15th day of December, following, Aldridge presented the Straton certificate for said stock to the secretary of The Big Huff Coal Company, and had the stock transferred in his name, a certificate was issued to him therefor, and shortly after that time he was elected a member of the board of directors of the corporation. The property of the coal company consisted entirely of undeveloped lands, situated in Wyoming County, from which no income had ever been received, and while the stock was non-assessable, it was customary for the stockholders who could do so to make a voluntary contribution each year to pay their proportionate share of taxes assessed against the corporate property. It appears that Straton had not been able to pay his share of the taxes for the years 1928, 1929, 1930 and 1931, and that such share amounted to $1679.21, which amount Aldridge agreed to pay and afterwards paid; so that at the time of his purchase of the stock he had either paid or assumed the payment of the sum of $3,088.72. Later, he paid taxes which were assessed from year to year, so that his investment in the stock, according to a statement appearing in the record, which does not seem to be disputed, is, including interest, $4,753.48, as of the 28th of January, 1939. In addition to this, the corporation, in 1936, purchased 212.96 acres of land adjoining its original holdings, and, according to the plaintiff's bill, not denied, paid therefor the sum of $8,907.35, most of which consideration was borrowed, and for which Aldridge and others executed their note, and took a deed of trust on

the property of the corporation to secure them on account thereof.

As stated above, Aldridge, on December 15, 1931, presented the Straton certificate for the three hundred seventy-five shares of stock to Harry H. Harvey, the secretary of the corporation, and asked that the certificate be cancelled and a certificate issued in his name for said stock, which was done. Harvey testifies:

> "When he brought the stock in, I asked him if he had any strings tied to it, and he said that he had agreed to let them have it back if they would reimburse him for what he had in it or what it cost him."

Thomas W. Harvey, who was then president of the coal company, and who signed the certificate of stock issued to Aldridge, when asked if Aldridge, at that time, made any statement as to his ownership of that stock, testified:

> "He said he had taken it over, but had given Mr. Straton the privilege of taking it back upon the payment to him of what he had put in it or what it had cost him."

When Aldridge testified, he was asked the following question, referring to the testimony of Harry H. Harvey:

> "Mr. Harvey has testified that at that time you made some statement to the effect that you bought the stock and was holding it for some relative,— Joe Straton,—and that you said you had agreed to let him have it back whenever he paid you what you had in it. Did you make any such statement as that to him?"

He answered: "No sir." He was then asked about the testimony of Thomas W. Harvey:

> "Tom Harvey said you made some statement about protecting Joe Straton, and that you said you bought the stock to protect Joe. Did you make any such statement as that?"

To which he answered: "No sir." We have, therefore, the statement of Aldridge that he did not make certain statements to the Harveys. The question propounded with respect to the testimony of Harry H. Harvey closely follows, and the answer thereto plainly contradicts such testimony. The question in regard to the statement made by Thomas W. Harvey is not in close accord with Harvey's testimony, which was that Aldridge said "he had taken it over, but had given Mr. Straton the privilege of taking it back upon the payment to him of what it had cost him." The testimony in this case appears to have been taken before the court, and counsel probably did not have before them the transcript of the testimony. The contradictions of Aldridge are not entirely satisfactory, especially as to the statement of Thomas W. Harvey. However, Aldridge expressly states in other parts of his testimony that he did not comply with Straton's request, and did not take over the stock for him.

On March 10, 1932, the plaintiff, Mae Sullivan Straton, went to Huntington to see Aldridge. At that time, her husband was away from home, and letters had been received from him indicating that he contemplated taking his life. Mrs. Straton was then in need of money and asked Aldridge to loan her $500.00. He did not comply with her request, but endorsed her note on which she obtained this sum at the First Huntington National Bank, and which she afterwards paid. She states that during the conversation with Aldridge on this occasion, Aldridge told her that:

> "Mr. Straton had previously borrowed $2,000.00 from the First Huntington National Bank and that he had endorsed the note, and that Mr. Straton had put up 375 shares of Big Huff Coal Company stock and that he, Mr. Aldridge, had that stock and if ever I was able to take it up he would turn the stock back to me for just what he had in the note,—just what it cost him."

The bill of complaint, with reference to this conversation, alleges Aldridge stated on this occasion "that she could

redeem the stock for whatever it had cost him, whenever she was able to do so."

Joseph Butcher Straton died on March 13, 1932, three days after the Huntington conversation noted above, and plaintiff herein qualified as administratrix of his estate. Nothing was ever said about this stock until in November, 1937, some five and one-half years thereafter. So far as the record discloses, Straton had no estate; it affirmatively appears that the home in which Mrs. Straton lived at Williamson was heavily encumbered; that she did not have funds with which to purchase or redeem the Coal Company stock until in November, 1937, when she obtained about $4,700.00 from her deceased father's estate; and that then, after consulting a banker in Williamson, and finding that she could obtain financial assistance from that source, she and her sixteen-year-old son, John Straton, called on Aldridge at his home near Huntington, and claimed the right to redeem or purchase this stock. We attach no particular importance to the difference in the statements of the plaintiff and her son touching the conversation with Aldridge on this occasion, nor, for that matter, her version of the conversation of March, 1932. Neither the plaintiff nor her son should be charged with knowledge of the meaning of the terms used in their technical application.

It will be remembered that Mrs. Straton stated Aldridge told her in March, 1932, that if she was ever able "to take it up he would turn the stock back to me." Testifying about the conversation with Aldridge in November, 1937, she states:

> "Mr. Aldridge had promised me that I could redeem the stock whenever I was able, and I came to him last November and offered to redeem the stock."

She then says, referring to the same conversation:

> "I told Mr. Aldridge that because of the recent sale I had some money and could get additional money at the bank and that I had come to see him

and asked him if I could redeem the stock in the Big Huff Coal Company and reminded him that in March, 1932, he had told me that whenever I was able I might redeem the stock, and I told him that I was then able to redeem it and had come for that purpose. Mr. Aldridge admitted that in March, 1932, he had told me that I could redeem the stock at any time I wanted to, but he said the stock at that time had but little value, but that now it had considerable value, and, as a matter of fact, certain people were interested in an option to buy it. He further said that at the time the stock appeared to have little or no value I showed no interest in redeeming it. * * * I talked with him a considerable while, he insisted that he could not turn my stock over to me, that I was too late and that he could not permit me to redeem it."

The testimony of John Straton, who was present, is:

"Mother told him she wanted to buy her stock back, that it was the only time since dad's death she had had any money, and that the property was the only way she had to educate me; and she wanted to buy it back for what it cost him, plus the interest. He admitted that he told her she could buy it back, but at that time the property was not worth much, but now it was worth something, and she had come too late."

Aldridge, in his testimony, denies the statements attributed to him by Harry H. Harvey and Thomas W. Harvey. He admits the fact of a conversation with Mrs. Straton at Huntington in 1932, and that he told her that "if she wanted the stock, I would sell it back to her for just what I had in it," but denies that he ever told her that she could redeem it. He admits that he would have sold the stock to Mrs. Straton or to any other person at that time for what he had in it. He defends his present attitude upon the ground that the stock at that time appeared to have little or no value, and that the plaintiff who is now claiming it was not then interested therein, and only became so after a long lapse of time, and under

circumstances which appear to have given the stock a greatly increased value. He sets up in detail the money paid by him on the Straton note, the payment of taxes which Straton was under obligation to pay, and those paid in subsequent years, pledging his credit for the purchase of additional land, and alleges that the plaintiff, if she ever had any rights, is now barred by laches from asserting the same.

The record shows that all of the property of the Big Huff Coal Company, except 212.96 acres purchased in 1936, was acquired in 1911, and it is alleged in the bill and not denied that the original cost of the property now owned by the said company was $113,309.05, and that the sum of $44,308.49 had been paid in taxes to and including the year 1936. It also appears that when Straton acquired this stock in 1927, under the will of his aunt, Vicie Nighbert, it was appraised at $40.00 per share, but there is other testimony indicating that in 1931, the stock had no market value, and that as late as 1935, a one-half interest in 816 acres of land, the other half of which was owned by the Coal Company, was sold for $500.00, subject to back taxes amounting to approximately $2,700.00, although it is contended that this sale was not made under competitive conditions. It is claimed by the plaintiff that the sale of the stock to Aldridge in 1931, was at a price grossly inadequate, while, on the other hand, Aldridge insists that he did not want to purchase the stock at the price he paid, and only did so as the sole means of protecting himself on account of his indorsement of the Straton note.

The claim of the plaintiff is based upon the theory of an express trust, which in itself is an admission that the title to the stock in question passed to Aldridge under a purchase from the bank. In this connection, it should be said that, aside from the question of inadequacy of price, which will be hereafter considered, we see nothing in the actual circumstances surrounding this purchase which in any way casts cloud upon Aldridge's title to the stock. The sale was made after notice to Straton, as is attested by his letter of November 30, 1931, addressed to Aldridge,

and after the same was advertised in a newspaper. It was made in due course by an official of the bank immediately after banking hours, presumably for the reason that the stock could have been redeemed by the payment of the note with which it was deposited at any time during banking hours. While there was no competitive bidding, there is nothing in the record to indicate that competition was prevented through any act of the bank or of Aldridge, or any other person. The extent to which sales under collateral agreements are upheld is well illustrated by two recent decisions of this Court. *Berry* v. *Neuhardt,* 117 W. Va. 67, 183 S. E. 858, *Highland, Executor,* v. *Davis,* 119 W. Va. 501, 195 S. E. 604.

Whether or not there was an express trust, such as the plaintiff claims, must depend on the weight to be given the Straton letter of November 30, 1931, addressed to Aldridge, and his subsequent acts and conduct with respect thereto. An express trust must be based upon an agreement, express or implied, or upon a clear declaration of trust by its creator. *Currence* v. *Ward,* 43 W. Va. 367, 27 S. E. 329; *Keller* v. *Washington,* 83 W. Va. 659, 98 S. E. 880; and as to personal property may be created verbally. 3 Pom. Eq. Juris. (4th Ed.), section 1008. If this be a case where an agreement is necessary to create a trust, as we think it is, then, such agreement must have been one between Straton and Aldridge, and, based upon the record before us, could only have arisen through an undertaking to comply with the request contained in Straton's letter to Aldridge. Aldridge expressly denies that he ever agreed to comply with Straton's request, and states that he did not purchase the stock with any idea of holding it for Straton's benefit. Admitting the receipt of the letter, he states that he does not remember whether he received it before or after the stock was purchased by him. In view of Aldridge's denial of any compliance with Straton's request, the testimony of Harry H. Harvey and Thomas W. Harvey becomes important as to what Aldridge had in mind when he purchased the stock in question.

Preliminary to the consideration of this testimony, it should be stated that Aldridge was under no legal obligation to comply with Straton's request that he purchase the stock and hold it for him. Straton had requested Aldridge to endorse his note, and had deposited this stock as collateral security. He knew, of course, that this stock could be sold if he failed to pay his note. His family relationship to Aldridge, the fact that they had grown up together, and however close the ties between them may have been, cannot, under the circumstances of this case, be considered as the basis of a legal obligation, or as creating a situation different in legal effect from that which would have existed between the parties had they been strangers. Much stress is laid on this relationship, and the confidence Straton had in Aldridge and his apparent belief that he could depend upon him for assistance; but we are unable to see that it has any controlling effect upon the legal question presented.

According to the Harveys, Aldridge told them in substance, and in slightly varying language, that he had purchased this stock, and that he had agreed to let them have it back if they would reimburse him what he had in it, or what it cost him. This is the statement of Harry H. Harvey. Thomas W. Harvey states that Aldridge said that he had taken over the stock, but had given Straton the privilege of taking it back on the payment to him of what he had put in it or what it had cost him. Aldridge denies having made any such statements, but does admit that he was willing at that time to sell the stock to Straton or to the Harveys for what he had in it, and says he did not want the stock at that time. He further says that it would have been "impossible" for him to have made any such statement because he had not purchased the stock with any such idea. The trial court apparently accepted Aldridge's statement as true. Otherwise, there might have been established an agreement which would have served as the basis of an express trust.

The conversations between Aldridge and the plaintiff require mention. On March 10, 1932, she had a conversation

with Aldridge in Huntington. At that time, she was in great distress on account of the disappearance of her husband. She asked Aldridge to loan her $500.00, and he arranged for her to get this sum from a Huntington bank. In the course of the conversation, according to her version, he advised her that Mr. Straton had borrowed a sum of money from the First Huntington National Bank and that he had endorsed Straton's note therefor; that Straton had put up three hundred seventy-five shares of Big Huff Coal Company stock and that he, Aldridge, had the stock, and that if she was ever able to take it up he would turn the stock back to her for just what he had in the note—just what it cost him. Aldridge, admitting a conversation at that time, says that he told the plaintiff that "If she wanted the stock I would sell it back to her for just what I had in it." In considering this conflicting testimony, it should be borne in mind that at the time of this conversation, Aldridge had paid a considerable sum of money in the form of taxes, in addition to what he had in the Straton note, and there is nothing in this record to indicate that Aldridge would have been disposed to yield any claim for money he had actually paid out on account of the stock transaction; nor was he under obligation to do so. The circumstances indicate that Mrs. Straton's recollection was at fault as to some of the details of this conversation; for example, she says that Aldridge stated that Straton borrowed $2,000.00 from the Huntington bank, when the loan was in fact $1500.00. This is not said with any idea of reflecting on her testimony. There is, in fact, little conflict in the testimony of Mrs. Straton and Aldridge, except as to the use of technical words. Then, too, it should be noted that this was a proposition to turn the stock back to Mrs. Straton and not to Joseph Butcher Straton who was then living, but whose whereabouts was unknown. The plaintiff did not again talk with Aldridge until some five years and eight months later, when, in November, 1937, she, with her son, John Straton, went to the home of Aldridge and asked to redeem the stock. John Straton says that she told Aldridge that she wanted to buy her

stock back. Whatever was said on that occasion,—and we attach little importance to the exact language used,— Aldridge refused to permit her either to purchase or redeem the stock, defending his refusal, first, upon the denial that he had ever agreed to hold the stock for Straton, and, therefore, the stock was not subject to redemption, and second, that inasmuch as Mrs. Straton had failed to take advantage of his offer to permit her to take over the stock for what he had in it at a time when the value of the stock was uncertain, he was not bound by his proposition nearly six years later when the market value of the property had greatly increased.

The trial court, in consideration of all of this testimony, and the circumstances surrounding the entire transaction, found that the evidence did not show an express trust between either the plaintiff's decedent, or the plaintiff in her own right, and the defendant Aldridge, and incorporated such finding in the final decree entered herein, and we are of the opinion that the same was justified. The facts and circumstances of this case, in our judgment, do nothing more than establish that, after acquiring the stock in question, Aldridge would, at that time, have turned it over to Straton or any other person for what the stock had cost him, and this is not sufficient to create a trust. While this Court will not hesitate, in equity causes, to reverse decrees rendered on conflicting evidence, where it is convinced that error exists, it will not do so unless the evidence and circumstances strongly preponderate against the decree under attack. *Buskirk* v. *Bankers Finance Corporation,* 121 W. Va. 361, 3 S. E. (2d) 450. In this cause we see nothing other than the testimony of the Harveys upon which plaintiff can reasonably base a claim of an agreement supporting an express trust, and if there was not such an agreement, there is nothing in the record upon which any character of trust can be predicated. The court having held, upon conflicting testimony, in favor of the defendant, we find no reason for disturbing his finding thereon.

Plaintiff relies strongly on the case of *Kersey* v. *Kersey*, 76 W. Va. 70, 85 S. E. 22. This was a case where property was obtained by one party through the influence of a relation of confidence and trust, growing out of business relationship which created a constructive trust in favor of one of the parties. It was there held that where a person obtained property under circumstances where, in equity and good conscience, he should not be permitted to hold and enjoy the same, a trust would be impressed thereon. This is not the case before us. Here, the plaintiff has relied upon an agreement, which the lower court held had not been established. Aside from an agreement, there is nothing in the record which establishes an obligation, on the part of Aldridge, to hold this stock for the benefit of the Straton estate.

The point of inadequacy of price is raised. If this were a case where an effort was made to establish a constructive trust upon the ground of fraud or otherwise, consideration might be given thereto; but we do not think it can be raised herein, unless it can be said to have a bearing upon whether there was or was not a trust agreement. If it can be raised, consideration should be given to the fact that at the time the stock was purchased by Aldridge, he paid some $1400.00 therefor by paying the full amount of the Straton note. The stock was encumbered, by taxes on the property represented thereby, to the extent of more than $1600.00, the payment of which was imperative, so that his total outlay in the acquisition of the stock was in excess of $3,000.00. The value of the stock at that time was problematical. That it had at that time great potential value may reasonably be argued, but when that value would be realized could not then be envisioned, and that there was risk involved in the investment, cannot be doubted.

Plaintiff cites the case of *Crawford* v. *Caplinger,* 110 W. Va. 498, 158 S. E. 717, in support of the proposition that where an express trust has been established, laches may not ordinarily be imputed to the beneficiary until the trustee repudiates the same. This is undoubtedly sound

law, but we do not think it applies to a case where inadequacy of price enters into an attempt to establish a trust. In such case, where after the lapse of time, the status of the parties has changed and the value of the property increased, we think a case is created where the doctrine of laches applies. The plaintiff sues as administratrix with the will annexed of Joseph Butcher Straton, and as beneficiary under said will, so that her claim as beneficiary is derivative. If her claim is made individually, and she relies upon the offer of Aldridge in March, 1932, we think her failure to accept the said offer within a reasonable time, and her apparent abandonment of any attempt to purchase the stock or redeem it, operates to prevent her from so doing at this time, on the ground of laches.

From a careful consideration of the record, we are unable to discern any error in the decree appealed from, and the same is affirmed.

*Affirmed.*