RUSSELL WEAVER *v.* ANNA WILLIAMS TREMBLY *et al.*

(No. 9575)

Submitted April 11, 1944. Decided May 16, 1944.

Kenna, Judge, absent.

F. E. Parrack, for appellants.

G. W. Ford, for appellee.

Fox, Judge:

Anna Williams Trembly and Charles Trembly complain of a decree of the Circuit Court of Preston County, entered on the 16th day of November, 1943, in a suit in equity in which Russell Weaver is plaintiff and the said Tremblys, husband and wife, are defendants, and which decree restrained and inhibited the defendants from interfering with the plaintiff in the operation of a coal mine on property owned by Anna Williams Trembly, and held under lease by the plaintiff. The parties will generally be referred to as they stood in the court below.

Anna Williams Trembly is the owner of a tract of 68.75 acres of land, situate near Tunnelton, in Preston County, in which lies a seam of coal estimated to contain 52.25 acres. This coal had been developed to the extent that a mine had been opened thereon, and operated for some period of time, and until sometime in July, 1942, when operations ceased. There was, at that time, twenty working places in the mine, and it appears from the record that the mine was capable of producing seventy-five or more tons of coal daily. On November 23, 1942, Anna Williams Trembly and Charles Trembly, her husband, executed a writing under seal, by which they leased to the plaintiff, Russell Weaver, for a period of one year,

with the privilege of renewing the same from year to year, for a period of ten years, on the same terms and conditions, provided notice of intention to renew was furnished the lessors at least thirty days before the expiration of any one year term, all the coal underlying the tract of land aforesaid, together with the coal opening, all mine cars, railways and equipment located at said opening. The royalties to be paid under the said lease were fifteen cents for each ton of marketable coal mined and removed from said property; and it was specified that payments of the royalties should be made, on or before the 30th day of each month, for all coal sold from said property during the month immediately preceding. There was also a provision in the lease by which it was covenanted and agreed that the lessee should have all necessary mining rights, and the right to load all coal that he might mine from the tract of land leased, or other tracts of coal that he might own, lease or sublease, over a dock recently used by Charles Trembly, on what is called the "Larew Spur" of the West Virginia and Northern Railway. It appears, from the record, that, at the date of the lease, the spur mentioned above was owned by the receiver of an insolvent bank, but was afterwards purchased by Charles Trembly and another.

The plaintiff immediately took possession of the leased premises, but did not actually mine coal therefrom until the 9th day of December, 1942. Between that date and December 15, when he ceased to mine coal therefrom, eighty-three tons of coal were produced, the royalties for which he subsequently tendered to the lessors. The plaintiff probably did some work in and around the mine prior to December 9. On December 15, plaintiff had two coal loaders in his employ. The record discloses that plaintiff was reluctant to enter into the lease agreement, and that after he began operations in the mine he complained of the coal being hard, and as containing too much sulphur, and expressed fears that he could not load the coal from said mine with coal being produced by him elsewhere,

from another mine being operated by him, because it might injure his market. It also appears that around the first day of December, 1942, plaintiff began negotiations for sub-leasing the mine with one William Larew, but Larew did not even examine the mine until the last week of December, and after, as contended by the defendants, the mine had been surrendered to them and the lease contract rescinded. Obviously, at the date of the alleged rescission of the lease, plaintiff was not successfully operating the mine and was, apparently, dissatisfied with the then existing situation.

On either the 15th or 16th day of December, 1942, probably the 16th, there was a conversation between J. C. Trembly and the plaintiff, at which Anna Williams Trembly was present. It is largely upon this conversation, and the light thereon thrown by both prior and subsequent events, that the issue in this suit must be determined. For that reason we think it advisable to quote certain portions of the testimony of the parties to that conversation. The plaintiff's version of the conversation, as testified to by him, is as follows:

"Well, Mr. Trembly sent word for me to come up on or about the Sixteenth of December, he wanted to see me; and I went up, and went to Mr. Trembly's house, and Mr. Trembly and I talked a while, and Mr. Trembly said to me, 'How about you giving up the lease for that mine?' I said 'No, I couldn't do that.' He said, 'Well, I think we have it sold.' I thought a little bit, and told him, 'If you have it sold, that is different;' and I said 'Well, now Mr. Trembly, you find out for sure whether you have the mine sold, and if you have, let me know, and we will do some trading on this lease.' 'Well,' he said, 'Maybe I might want to operate it myself.' 'Well,' I said, 'If you can get you some men, and let me know, and we will do some trading again.' I said 'Men is awful scarce;' and he said 'Well, let's trade here.' I said 'No.' He said 'Let's agree what we will do,' and I said 'No, it's best to have it on paper,' and he said 'Well, we can write out a paper,' and I said 'No,

you see if you can get some men, and I will come up and we will fix up an agreement.' That's about all was said. I said 'I have only two men working, and if you want to get some more men I will go ahead and tell my men not to come out any more until we see what we will do,' and he said 'Okeh,' and I went home."

J. C. Trembly, testifying to the same conversation, makes the following statement:

"This is what I said to him: 'It seems like you are not doing anything at the mine;' 'Well, he says, it seems like I can't do anything.' I let him study it over a little, and then I says 'How about giving it up?' I says 'I might have a chance to sell it, or we would operate it ourselves.' He says 'That suits me all right, I'll give it up.' "

And Anna Williams Trembly, who heard this conversation, gave her version thereof in the language following:

"Every time I would see him he would complain about the coal; and that evening he said he didn't think he could make a go of it, and Charlie said 'If you think you can't make a go of it, how about giving up the lease, and we will try to take it over;' and he said he wouldn't have any place to load his coal, and we said we wanted to do the right thing, 'You can use the dock until you build a dock,' and he said 'All right, that settles it; I will take the feed back, and you people go ahead.' "

At the time of the execution of the lease, there were some negotiations with respect to the purchase of two ponies which the Tremblys had used in the leased mine. There are some immaterial disputes as to what this agreement was, but certain it is that on December 7, 1942, the plaintiff sent for the ponies, and, at that time, Trembly refused to deliver them, but apparently did so later. At the time of the conversation of December 16, plaintiff had been using the ponies in the operation of the mine, and had been buying feed for them from a man by the name of

Watson, residing in Tunnelton. Following this conversation, the plaintiff left these ponies in the possession of the Tremblys, and from that time on ceased furnishing feed for them, and, according to the testimony of some witnesses, went so far as to return some feed which he had already purchased, and countermanded an order for feed he had already placed with Watson. The two men who were loading coal in the mine on the last day the plaintiff operated the same did not return to work. The foreman employed by the plaintiff was told by him, probably on December 16, that the Tremblys, for some reason, wanted the mine back, and that he did not know what he would do about it, but if the foreman did not hear from him within two or three days he could take his tools from the mine. The plaintiff did not further interest himself in the mine, or in his lease therefor, until the very last of December, as will be hereinafter mentioned.

According to the evidence, the Tremblys took possession of the mine on the 23rd day of December, 1942, one week after the December 16th conversation, and continued to operate the same up until the institution of this suit, and since that time. They say they took possession of the mine following the agreement they had with plaintiff on December 16. On December 26 a conversation occurred between the plaintiff and J. C. Trembly, at which Anna Williams Trembly was present, about which there is some dispute. Plaintiff testifies that Trembly said to him "Can you come up the first of the week sometime, and we will fix up that agreement and I can start to work", and that he said "Yes, I will come up sometime the first of the week, and Mr. Trembly got in the car and drove off". Two other witnesses substantially corroborate the plaintiff as to this conversation. J. C. Trembly admits the conversation, but claims that he told him to "Come over, I wanted to see about arrangements for to build him a dock"; and Anna Williams Trembly, on cross-examination, said her husband visited the plaintiff on the occasion referred to, stating: "Let's drive out and see Mr. Weaver, and see if

he has any intention of starting another dock", but she is not very definite about what the conversation between her husband and the plaintiff was on that occasion. It is pertinent to note that at the date of this conversation the defendants had already taken over the mine and had been operating the same for three days. The very last of December the plaintiff attempted, through one Rhodes, to send word to the Tremblys to cease taking coal from the mine. On the 29th or 30th of December, plaintiff wrote the Tremblys a letter to the same effect. On January 2, 1943, he had served on Charles Trembly and Anna Williams Trembly a notice not to "mine, remove, disturb or in any way interfere or damage any of the property leased to me by you". On January 22, 1943, he tendered to the Tremblys $12.45, representing royalty on eighty-three tons of coal mined in December, 1942, which tender was declined for reasons not necessary to state. On February 11, 1943, counsel for the plaintiff wrote a letter to Charles Trembly, by which he was notified to vacate the leased premises and allow the plaintiff to operate the mine under his lease, and he was advised that unless he complied with the notice suit would be instituted to vindicate the plaintiff's alleged rights. This letter was answered by counsel for the Tremblys. Nothing resulted from this correspondence, and on the 9th day of March, 1943, this suit was instituted.

The bill, filed at April Rules, sets up the plaintiff's lease; that he was deprived of the right to operate thereunder; and avers trespass on the leased premises by the defendants; and, generally, that he was being deprived, by the conduct of the defendants, of the right to operate the said mine, and of the right vested in him to renew said lease, and of the right to make large profits, through the continued trespass of the defendants. The prayer of the bill is that the defendants be restrained and enjoined from further interfering with the plaintiff in the possession of the said mine, and from removing and transporting coal therefrom, and from interfering, in any manner whatso-

ever, with the plaintiff's right to possession and operation of the mine, under the lease aforesaid, and for general relief. The defendants filed their answer to the bill, consisting of eight separate sections. First, that Everett Williams and Virginia Williams are necessary parties. This allegation is apparently based upon the interest of these parties in and subsequent possession of the Larew Spur, hereinbefore referred to; by the second section of their answer they admit the ownership of the coal in question; by the third section they admit the execution of the lease in question; by the fourth section of their answer they aver that the plaintiff had forfeited his right to continue the operation of said lease by non-usage thereof, basing said allegation upon the statement contained in the plaintiff's bill that eighty-three tons of coal had been produced therefrom by the plaintiff. The sixth section referred to the transaction by which, it was contended, the two mine ponies had been purchased, and that defendants had refused to accept the tender of royalties, alleged in the bill, because, as they claimed, the plaintiff owed them money greatly in excess of that sum for keeping the ponies and furnishing certain supplies. By the seventh section is averred the surrender of the lease and the mine on the 16th day of December, 1942, and that plaintiff's conduct in now claiming the mine is inequitable. By the eighth section there are certain allegations which, in the court's order on the demurrer to the said answer, are referred to as C, D and E, regarding the purchase of the Larew Spur, and as to certain amounts paid for the use of said railway spur, and an allegation as to the value and use of the said spur.

The plaintiff demurred to this answer, and on July 24, 1943, the court sustained the demurrer as to sections 1, 4 and 6 thereof, and as to paragraphs C, D and E of Section 8 thereof, thus eliminating all questions as to the ponies and the Larew Spur.

We think the action of the Court with respect to the demurrer was correct, unless it be that part thereof re-

lating to Section 4 of the defendant's answer. That allegation, if taken for true, and it must be on a demurrer, alleges that plaintiff had forfeited his right to continue operation of his lease by non-usage thereof, and, in our opinion, at least made an allegation sufficient upon which proof could be taken, or, if not denied, a decree might be entered. This error, if it was an error, is not prejudicial, for it may be well to say that the record before this Court does not, in our opinion, furnish sufficient basis for any decree forfeiting the lease for non-usage. The time plaintiff held this lease, especially the time between the date of the lease and the time when it was claimed to have been surrendered, was entirely too short to warrant a holding that plaintiff had failed to properly develop the mine. It will be noted that the lease did not contain any requirement in this respect, although it might be contended that there was an implied obligation on the part of the lessee to develop the mine in a reasonably efficient manner.

When the court acted on the demurrer, there was left only the question of whether there had been a rescission of the lease and a surrender of the leased premises. A hearing was held, and practically all the testimony taken related to that question. The trial court found for the plaintiff, and, on the 16th day of November, 1943, entered a decree by which the defendants, and each of them, were restrained, enjoined and inhibited from further interfering, in any manner whatever, with the plaintiff in his right to the possession and operation of said mine, under the terms of the lease aforesaid, executed to him by the said defendants under date of November 23, 1942. On the application of the defendants this appeal was granted.

The sole material question presented to the trial court was whether the plaintiff had surrendered the lease and possession of the coal mine to the defendants on December 16, 1942. The court decided that question in the negative, and entered the decree complained of. We think that in so doing the court erred, for reasons which we will attempt

to state briefly. In doing so we will consider not only the conversation between plaintiff and defendants, admittedly held on December 15 or 16, 1942, but matters throwing light on the said conversation occurring both before and after that date. We think it entirely clear that the plaintiff accepted the lease of November 23, 1942, with some reluctance. He was slow to enter upon the development of the mine, and was apparently dissatisfied with it. Immediately, and not later than December 1, 1942, he attempted to interest William Larew in subleasing the mine, but up to the crucial conversation had not been able to get Larew to even inspect the mine. He did not begin operations until December 9, 1942. While he had made some arrangements about the use of the ponies, he did not send for them until December 7, two days before he began operating the mine. He operated the mine for six days and produced eighty-three tons of coal. One of the defendants stated that he was complaining about the character of the coal, and his fears that it would interfere with his market, as to the coal being produced by him from another operation, if he mixed his production. Everything indicated that, prior to December 16, his operations had been unsuccessful, and that he was attempting to get rid of this mine, although by subleasing the same it may be assumed that he expected some return for his interest therein. Then this conversation of December 16 occurred. There is no question as to the fact of the conversation, or as to who was present when it occurred, or the subject thereof. The only dispute is whether or not there was a definite agreement reached by which the mine was to be surrendered. The plaintiff says no such agreement was reached. The defendants say that a definite agreement was reached at that time, by which the mine was turned back to them. The parties may be honestly mistaken as to what occurred. It is not unknown for parties to a conversation, when called upon to repeat it, to greatly vary in their statements as to what actually occurred.

But what happened after the conversation?  Plaintiff did not return to the mine.  He surrendered to the Tremblys the two ponies which he had been using, and there is no evidence that he contemplated any other method of transporting coal in the mine.  He had been furnishing feed for these ponies, and after this conversation ceased to furnish further feed, cancelled orders for feed, and, it is said, returned some feed which he already had in his possession.  The two men who were working at loading coal in the mine on December 15 did not return to work on the day following.  His mine foreman was advised by plaintiff that the Tremblys wanted the mine returned to them, and that he didn't know what he would do about it, but that if the foreman didn't hear from him (the plaintiff) within two or three days, to take his tools from the mine.

William Larew inspected the mine the last week in December, and at that time found the Tremblys in possession of the mine, and men working for them therein.  The record does not disclose whether Larew immediately communicated what he found there to the plaintiff, but certain it is that about that time the plaintiff, after two weeks' silence, became alive to his interests, and began sending word and writing letters to the Tremblys, claiming the mine.  Subsequent to December 16, and up to the date when he began serving notices to the Tremblys, he had shown no interest whatever therein.  He followed his activities of the very last of December by giving the notice above referred to on January 2; tendered payment of royalties later in the month, and in February had his attorney write the Tremblys, demanding possession of the mine.  Of course, the actions of the plaintiffs, after this controversy arose, have no bearing on the case, because self serving, just as the fact that the defendants took possession of the mine, would be of no value to them, provided they did not have the right to do so.

We think the evidence on the question of the surrender of the mine clearly preponderated in favor of the defend-

ants. We do not reach this conclusion because of the fact that the two witnesses testified in favor of the defendants' contention as to the conversation of December 16, while only one testified in favor of the contention of the plaintiff. These witnesses were directly interested, being the plaintiff and the defendants in this suit. The trial court had opportunity, which this Court has not had, to observe the three witnesses who testified on this question, and we would not set aside his conclusion on the sole fact that the preponderance in the number of witnesses is on the side of the defendants. We think the court erred because he failed to give weight to circumstances, shown to have existed both before and after this crucial conversation. These circumstances, we think, point unerringly to the conclusion that the defendants' version of the conversation of December 16 is the correct one. We have referred to these circumstances above and it is not necessary to repeat them.

It is, of course, a settled law in this state that the findings of a trial court in equity cases will not be disturbed on appeal, unless clearly against the preponderance of the evidence. Many cases can be cited in support of that principle. It is only necessary to cite 1 Michie's Digest, Va. and W. Va. Reports, 504-5; Vol. 1, Permanent Supplement 168, and cases there cited. On the other hand, it is equally well settled that the findings of a trial court will be set aside on appeal, if plainly wrong, or against the clear preponderance of the evidence, and this principle is announced in three recent cases decided by this Court. *Gall* v. *Cowell*, 118 W. Va. 263, 190 S. E. 130; *Buskirk* v. *Bankers Finance Corp.*, 121 W. Va. 361, 3 S. E. 2d 450; *LaFollette* v. *Croft*, 122 W. Va. 727, 14 S. E. 2d 917.

We think it clear that the lease in question can be surrendered by parol. We have not been cited to, nor have we found any authority on the exact question presented. But, at the most, the lease in question was an executory contract in writing and under seal for the lease of real estate for a period of one year, with certain re-

newal rights, and not a sale thereof. It seems well settled in this state, as stated by Judge Brannon in *Cunningham* v. *Cunningham,* 46 W. Va. 1, 32 S. E. 998, that "* * * an executory contract for the sale of land, whether written or oral, can be rescinded or waived, in equity by word of mouth, if possession be given up, or the writing be destroyed, but not without something done by way of execution of the rescission or waiver." *Ballard* v. *Ballard,* 25 W. Va. 470; *Boggs* v. *Bodkins,* 32 W. Va. 566, 9 S. E. 891; *Straley* v. *Perdue,* 33 W. Va. 375, 10 S. E. 780; *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501-511, 44 S. E. 433; *Colburn* v. *Keyser,* 96 W. Va. 507, 123 S. E. 430. If that be true as to a written contract for the sale of real estate, why should not the same rule apply to a contract of lease, written or oral? The defendants took possession of the coal mine within one week from the date of the conversation by which it is claimed the mine was surrendered, and therefore something was done by way of executing the oral contract of rescission, surrender or waiver of the lease agreement. While the defendants were so acting, Weaver stood by and made no effort to continue operation of the mine. For the reasons given above, we think the lease was orally rescinded and the mine surrendered on December 16, 1942.

We therefore reverse the decree of the Circuit Court of Preston County entered on November 16, 1942, and a decree will be entered here dismissing the plaintiff's bill, with costs to the defendants in the Circuit Court and in this Court.

*Reversed; decree entered here.*