GRACE M. GAYLORD *et al., Admrs., etc., v.* HOPE NATURAL
GAS COMPANY *et al.*

*and*

GRACE M. GAYLORD *v.* SUSIE P. KIGER *et al.*

(No. 8914)

Submitted February 7, 1940.   Decided March 26, 1940.

*Wm. P. Lehman, M. M. Neely, Robinson & Stump* and *Wyatt & Randolph,* for appellants.

*A. F. McCue, Kemble White, H. M. Garrett, Louis A. Henderson* and *P. Douglass Farr,* for appellees.

Fox, Judge:

Mary E. Harper, Isabelle M. Young, J. Howard Maxwell and Edwin L. Maxwell, children and heirs at law of Lewis Maxwell, deceased, complain of a decree of the Circuit Court of Doddridge County, entered on the 27th day of May, 1938, in the consolidated chancery causes of Grace M. Gaylord and others as administrators of the estate of Lewis Maxwell, deceased, against the Hope Natural Gas Company and others, and Grace M. Gaylord against Susie P. Kiger and others. The first of said causes was a suit to settle the estate of Lewis Maxwell, and the second was to ascertain the amount of advancements made by him in his lifetime to his children, and for partition of his real estate. In the decree appealed from, the court excluded Isabelle M. Young, J. Howard Maxwell and Edwin L. Maxwell from any interest in the estate, on the ground that the advancements to them, respectively, exceeded the interest in the estate to which they would have been entitled had no advancements been made, and charged Mary E. Harper with advancements in excess of those which she contended had been made to her. From this decree, the appellants jointly prosecute this appeal. The principal questions raised relate to the amount of the advancements, and the value of the estate involved.

Lewis Maxwell died intestate on the 22nd day of October, 1934, and Grace M. Gaylord, Susie P. Kiger, J. Howard

Maxwell and Everett W. Maxwell qualified as administrators of his estate. Lewis Maxwell was the owner of approximately seven thousand acres of land in Doddridge County, the bulk of which lay in contiguous tracts and when surveyed was found to contain 6,545.26 acres; another tract of 396.62 acres; and some smaller tracts. This property had been developed for oil and gas purposes. He also owned interests in oil and gas situated in the adjoining counties of Harrison, Lewis, Ritchie and Gilmer, and was the owner of considerable personal property. The property about which any controversy as to value exists is located in Doddridge County. E. M. Nutter, a former county official, Hall Maxwell, clerk of the county court, and U. G. Summers, a prominent business man, having been duly appointed as appraisers, appraised the Doddridge County land, excluding oil and gas interests, at $120,120.00, and the oil and gas rights at $71,507.00. The oil and gas interests in the counties of Harrison, Lewis, Ritchie and Gilmer were separately appraised, as the law requires, at $7,920.00. The personal estate was appraised at $26,504.12, making the total appraised value $226,051.12. No question seems to have been raised on the record as to the appraisement of the outlying oil and gas property or the personal estate.

Lewis Maxwell was twice married and was the father of fourteen children. Four of the six children of the first marriage, or their descendants, accepted money and property from Lewis Maxwell as their full share of his estate. They were made parties to this litigation and made no claim to any share in his estate. The remaining children, two by the first marriage and eight by the second, received from their father, from time to time, over a period of many years, gifts of money and property. The record discloses that it was his purpose to treat all of his children equally, which bears upon the purpose of the said Lewis Maxwell in making the payments to his children which are now contended to be advancements. He kept a book in which he stated would be found the amount of the advancements to each of his children, but this book

has not been produced, and cannot be found. No blame attaches to any one by reason of its absence. It is only mentioned to indicate that Lewis Maxwell, as a part of a plan and system, made advancements to his children and expected them to account for the same in the final settlement of his estate.

This being the situation, Code, 42-4-1, applies. The section reads:

> "Where any descendant or collateral relative of a person dying intestate as to his estate, of any part thereof, shall have received from such intestate in his lifetime, or under his will, any estate, real or personal, by way of advancement, and such descendant or collateral relative, or any descendant of either, shall come into the partition and distribution of the estate with the other parceners and distributees, such advancement shall be brought into hotchpot with the whole estate, real and personal, descended or distributable, and thereupon such party shall be entitled to his proper portion of the estate, real and personal."

The doctrine of hotchpot is a common law principle, first enacted into the statute of Virginia at a very early date, and was clarified and perfected in 1849, and, with slight amendment, has been carried down through the years and is now embodied in our Code as quoted above. Under this provision, an heir who has received advancements has the election of retaining such advancements without making claim to a share in the estate, or to ask for his share in the estate, in which event, he is required to bring into hotchpot the amount of any advancements received by him.

At the time of the death of Lewis Maxwell, his estate was indebted in the sum of $157,647.51. A part of this indebtedness was represented by indorsements for certain of his children, and subsequent to his death, payments were made by the principals, reducing the net indebtedness to $137,362.12. This latter figure is not disputed by any party, and will be hereafter used as admitted by all litigants. It appears, however, that with this very large debt

hovering over the estate, the heirs concluded that some effort should be made to adjust the affairs of the estate and save it from sacrifice at a forced sale. It seems to have been understood that each of the children of Lewis Maxwell had received advancements, and that it would be necessary to ascertain the amount of the respective advancements. A meeting was held at the late residence of Lewis Maxwell on the 2nd day of February, 1935, at which time all of the heirs were represented, either in person or by duly authorized agents. At that time, it was agreed that the checks and papers of Lewis Maxwell were to be turned over to U. G. Summers, a gentleman well acquainted with Maxwell's business affairs, and he was asked to go through all of these papers and checks and ascertain the amount advanced by Lewis Maxwell to each of the ten children who were then supposed to be entitled to a share in his estate. On the 24th of February, 1935, Summers submitted a statement of what he considered as advancements made to each of said children, at a meeting held at the Maxwell home, at which all of the ten children were present in person except Isabelle M. Young, and she was not in any way represented. This statement, in the main, was made up from the checks and papers placed in his hands, but he made some independent investigations with respect to the value of certain advancements made in real estate, and he also relied upon information furnished him by some of the Lewis Maxwell children. A copy of the statement was submitted to each of the heirs present and each was asked separately whether or not the report was acceptable as a true statement of his or her individual advancements. Claims were made and allowed that certain charges were improper, while on the other hand, in two instances, admissions were made that additional amounts should be charged. At that time, each heir present, separately and individually, agreed that the amount charged was proper, either as originally submitted, or as changed at the meeting. Isabelle M. Young was not, of course, in any way bound, either as to the sum reported against her or the amounts reported against the other

children. The appellants make no denial of what occurred at either of these meetings, but they explain their acceptance of the statement in its final form, by saying they understood an agreement of some character was necessary at that time in order to place the administrators in a position to refinance the estate. It is contended, however, that efforts to refinance the estate had already failed, and that the admission of the several heirs, as to the amount received by them, as advancements, was not complicated by such necessity.

Shortly after this second meeting, these suits were instituted. The causes were consolidated and referred to a commissioner in chancery. Testimony of U. G. Summers and a stenographer who kept a record of the meetings was introduced before the commissioner which establishes the fact of the two meetings, and of the agreements and admissions there made, but in the proceedings before the commissioner it was conceded that the statement prepared by Summers had no value as evidence, and that it was introduced as a memorandum to assist the commissioner. The checks and papers of Lewis Maxwell which Summers had used in making up the statement were filed before the commissioner, and it is upon these papers and checks and the testimony introduced before him that the court relied in entering the final decree, as expressly stated therein; likewise, upon these checks, papers and testimony the commissioner made up his report, although there is some little confusion on this point by reason of a statement contained therein that, in his opinion, certain additional charges should have been made against various heirs, but were not made because he felt he "would not be justified in disturbing a settlement among the heirs as to advancements which had been agreed to by all." It may here be stated that there is no denial that each and every item reported by the commissioner as an advancement was in fact received by the heir to which it is charged. On behalf of the appellants there is the contention that certain moneys received by them were not intended as advancements.

The law applying to advancements is well settled in this

state. It was settled in Virginia before the formation of this state, and the decisions of the two states have run along together up to this date. Certain unquestioned rules have been established: (1) A gift of money or property by a parent to a child is presumed to be an advancement. *McClanahan* v. *McClanahan*, 36 W. Va. 34, 14 S. E. 419; *Roberts* v. *Coleman*, 37 W. Va. 143, 16 S. E. 482; *Neil* v. *Lumber Co.*, 82 W. Va. 24, 95 S. E. 523; *Rowe* v. *Rowe*, 144 Va. 816, 130 S. E. 771. (2) The value of any advancement is to be determined as of the date when made. *Kyle* v. *Conrad*, 25 W. Va. 760, 781. (3) Interest on an advancement shall be charged from the date of the death of the parent. *Kyle* v. *Conrad, supra*, 784 of 25 W. Va. (4) The value of all property of the parent to be distributed shall be ascertained as of the date of his death. Code, 42-1-1, and 42-2-1; *Kyle* v. *Conrad, supra*. (5) A gift to a son-in-law, unexplained, is presumed to be an advancement to his wife. *Roberts* v. *Coleman, supra; Peale's Adm'r.* v. *Thurmond*, 77 Va. 753; *Bruce* v. *Slemp*, 82 Va. 352, 4 S. E. 692; and *McDearman* v. *Hodnett*, 83 Va. 281, 2 S. E. 643. (6) When the fact of advancements is established, equity seeks equality as between children. *Payne* v. *Payne*, 128 Va. 33, 104 S. E. 712. (7) The intention of the parent should prevail in all cases (*Roberts* v. *Coleman, supra*), and in line with this principle, the presumption of an advancement may be rebutted, either by statements as to his intentions at the time of the gift, made at that time or subsequent thereto. *Watkins* v. *Young*, 31 Gratt. 84, 72 Va. 84; *McDearman* v. *Hodnett, supra; Rowe* v. *Rowe, supra; Neil* v. *Lumber Company, supra*.

The commissioner, in making his report, closely followed the statement submitted by U. G. Summers. He ascertained the amount of advancements made to each of the ten heirs and counted interest thereon from the date of the death of Lewis Maxwell to the date of the filing of the commissioner's report on December 22, 1937. There was included in the total of the advancements some moneys paid by the administrators of the Lewis Maxwell estate on account of his indorsements for J. Howard Maxwell

and Edwin L. Maxwell, but as to all of the other heirs, the charges were for moneys or property received prior to the death of the father. The additional charges against the parties named above in no way affect their right to participate in the estate, and while not, strictly speaking, advancements, the treating of them as such is not prejudicial to any party in interest. The advancements so reported, with interest, aggregate the sum of $228,322.14, and the report of the commissioner as to the amount of these advancements was sustained by the court in its decree.

We think the court's action in this respect was proper. We have here the admitted fact that Lewis Maxwell followed a plan of making advancements to all of his children. He began making such advancements in 1897 in both small and large amounts. Sometimes they were represented by the conveyance of land, at other times, he denominated them loans, but never at any time required any evidence of the existence of a debt arising therefrom. In some instances, he simply gave a check without any notation whatever, and perhaps, in other cases, denominated them as gifts. Having in mind his desire that his children should have an equal share in his estate, and the rule of law that seeks equality between heirs in cases where advancements are brought into hotchpot, we have no doubt that equity will be served as between these heirs by treating all of the payments charged in the commissioner's report, made prior to the death of Lewis Maxwell, in whatever form they may have been made, as advancements. The contentions of Isabelle M. Young and Mary E. Harper, that large sums of money were paid to them as gifts, are not supported by any competent testimony rebutting the presumption in favor of advancements, and are apparently out of line with their indulgent father's intentions with respect to the division of his estate. No good reason is perceived why he would thus favor two of his children over eight others, and we do not think he meant to do so. Except as to the claim of Isabelle M. Young in regard to a charge of $10,000.00, represented by two drafts sent to her by her father on the 15th day of February, 1930, and which

will be hereinafter discussed, we do not doubt that the commissioner's report is correct as to each and every charge made against these heirs; and we think that the checks and papers introduced, and testimony taken before the commissioner, aside from any question of the admissions or agreement of February 24, 1935, as to these charges, will justify the commissioner's report. Again we say that the evidence of actual receipt of these moneys and properties by the several heirs is clear and undenied, and nothing has been introduced which overcomes the presumption of law that they were intended as advancements. On this basis, and following the commissioner's report as confirmed by the court, the ten heirs of Lewis Maxwell whose interests are involved in this litigation, were properly charged with advancements as follows: Susie P. Kiger, $14,037.22; Grace M. Gaylord, $10,915.75; Mary E. Harper, $16,953.63; Ruth Davies, $6,128.50; Hugh J. Maxwell, $14,352.95; Leeman Maxwell, $6,025.21; Edwin L. Maxwell, $61,512.51; J. Howard Maxwell, $47,394.48; Everett W. Maxwell, $11,138.92; and Isabelle M. Young, $39,861.97.

At this point, it becomes necessary to pass upon the action of the commissioner and the court in determining the value of the estate of which Lewis Maxwell died seized and possessed. As noted above, the estate was appraised at the sum of $226,051.12. The commissioner found the value of said estate as of the date of Lewis Maxwell's death to be $245,841.12. This valuation is attacked by the appellants as being too low, and defended by the appellees as being fair and just. By reference to the appraisement of the Doddridge County lands, we find that they were assessed for the purpose of taxation for the year 1934 at $159,295.00. This assessment, of course, included the mineral interests, oil and gas, and the timber thereon. In the report of this appraisement, the lands are described in detail, and it is stated that one tract of 1643 acres and 7 poles contains approximately 150 acres of "medium timbered land", and that another tract of 2564.88 acres, located on the waters of Arnolds Creek, included 300 acres of tim-

bered land. As to a tract of 1725 acres and 106 poles, located on the waters of Bluestone Creek, it is stated that the valuable timber on the land had been marketed. These three tracts make up the bulk of these lands, and include 450 acres of timber which the appraisers considered of value. It will be noted, too, that in this appraisement, the oil and gas interests in the several tracts of land included in the appraisement, are appraised at $65,600.00, so that the property which was assessed for the purpose of taxation at $159,295.00 is appraised at $185,720.00.

Considerable testimony was taken on the question of value, and this bore first upon the value of the surface of the Doddridge County lands. The three appraisers testified that their appraisal represented the fair market value of said properties, although one of them stated that it was conservative. Two witnesses, being men of affairs in Doddridge County, and who stated they were familiar with land values, were of the opinion that the value of the lands, excluding timber, ranged from $15.00 to $16.00 per acre; while two other witnesses testified as to surface value, one of them stating that in his judgment these lands were worth $30.00 to $40.00 per acre, and the other that they were worth $30.00 per acre. The appraisers' valuation of these lands, which included timber, was approximately $17.16 per acre, so that we have five witnesses testifying to a value not in excess of $17.16 per acre, one witness testifying to a $30.00 value, and another stating the value from $30.00 to $40.00 per acre. As to the timber, three witnesses testify to having found 1600 or 1700 acres of timber land on Arnold's Creek, the timber on which they estimate at 15,000,000 feet, of the value of $8.00 a thousand feet, or a total value of $120,000.00. Another witness examined the timber on 1,000 acres on Lick run and George's Camp, in the same vicinity, these lands comprising one large tract, and found 1,300,250 feet, which he thought was worth $10.00 per thousand. Another witness testified to finding 658,075 feet, worth from $8.00 to $10.00 per thousand, on scattering tracts aggregating about 100 acres of timber. On the other hand, another witness was shown over all of

the Maxwell lands, spent about a week thereon, and found 3,020,000 feet, the greater portion of which he estimated to be worth $6.00 per thousand. Without meaning to be too critical of estimated quantities and values of timber, we cannot escape the impression that the statement that cut-over timber land, such as this is admitted to be, contains as much as 9,000 feet to the acre, and is worth $8.00 per thousand feet, or approximately $70.00 per acre, is an exaggeration. Such statements are not aided by the testimony of another witness who examined a large tract of similar timber, in the same neighborhood, and found 1,300 feet to the acre, the same witness testifying at another point that the timber he found on 1,000 acres was 13,003,250 feet. Whether this represents a typographical error on the inability of the witness to state the correct amount of timber he found, we do not know, but it is not testimony upon which we can confidently rely, and we can well understand why the commissioner apparently did not give it great weight. The testimony of the witness who found 3,020,000 feet of timber would seem to be more reasonable. In the first place, it would appear that his qualification to estimate timber and its value is superior to that of the other witnesses who testified on this point, and the report of the appraisers as to the amount of timber acreage, while possibly not evidence, is a part of the record of the cause, and tends to support the lower estimate as to the amount of timber on these lands. It may be said that an average struck from this conflicting evidence should be used to reach the fair market value of this timber. This depends on the character of the testimony. We do not think such a method would reach a correct result in this case.

There is conflicting testimony as to the value of the oil and gas interests in Doddridge County. The testimony of two witnesses, each estimating the value of different properties, fixes the value of these properties at approximately the same as that fixed by the appraisers. The testimony of another witness fixed a value thereon of five times the annual income therefrom, which calculated would be approximately $107,000.00. Two of the witnesses were of the

opinion that these properties should be appraised at three and one-half times their annual income. All of the witnesses who testified as to the value of the oil and gas values were eminently qualified to do so. Viewing the situation from present day knowledge, rather than that existing at the date of Lewis Maxwell's death, the higher value placed on such properties seems the more reasonable one, although the situation is one in which the striking of an average might be justified. Admittedly, the development of these oil and gas properties has extended over many years, and the properties have been fully developed. Many of the wells are old, and production is declining, as the record shows. The income therefrom has decreased and will continue to decrease, although oil and gas will be produced for many years to come. How rapidly this production will decrease was, of course, unknown at the time of the death of Lewis Maxwell, and is not known now. The purchase of such property is one of hazard, which, under ordinary circumstances, men do not engage in, except when they believe large profits are to be expected. All these considerations have a bearing upon the fixing of the value of property of this character.

After considering all of this testimony as to values, the commissioner increased the value of the estate over the appraisement approximately $20,000.00. Apparently, this increase applied to the real estate or oil and gas interests, as there never has been any question raised as to the personalty. Whether this increase was on account of what he thought was the value of the surface, the timber, or the oil and gas, we do not know. But it is apparent that he gave some recognition to this testimony. We cannot say that the commissioner was clearly wrong, and under well established rules, we do not feel that we should disturb his finding as to values. As we shall show a little later, the fixing of this particular value by the commissioner is not all important. The value which would have to be fixed, in order to permit certain of the appellants to share in this estate, would have to be much in excess of that fixed by the commissioner, and beyond any point which we think

the commissioner and the court below would have been warranted in going.

It appears from the record that the administrators of the Lewis Maxwell estate have disposed of certain personal estate and collected oil and gas rentals and royalties which they have used to pay taxes, interest on, and in reduction of, indebtedness. It is contended that the income of the estate should be taken into consideration to reduce the net indebtedness and thereby increase the valuation of the estate. We have not been cited to any authority sustaining this view, and we have found none. Our statutes of descent and distribution seem to contemplate the passing of title at the death of an ancestor. Code, 42-1-1, and 42-2-1. Undoubtedly, the title to real estate vests in the heir at the death of the ancestor, and, subject to indebtedness, the personal estate as well. The applicable rule is well stated in *Kyle* v. *Conrad, supra,* page 784 of 25 W. Va.:

"There is no where any intimation, that there is any difference as to the time, when interest should be charged against a party, whether the advancement be of personal or real property; and there is no ground for any distinction being drawn, for on the death of the intestate the interest of the distributees is as fixed and determined on the death of the intestate as that of the heir. The equality sought by the law requiring real and personal property advanced to a child to be brought into hotchpot is equality at the death of the intestate; and therefore in both cases interest is charged on the value of the property at the time it was advanced, the interest to be from the death of the intestate. The fact, that for the convenience of the personal representative he can not be compelled to make distribution in less than a year after the death of their intestate, has, it seems to me. nothing to do with the time, from which advancements of personal property are to bear interest. They like real estate bear interest from the date that the law intends equality among the children to be established, that is, from the death of the intestate. I have seen no authorities, which draw a distinction in this respect between real and per-

sonal property advanced, and I consider that there
is no difference."

Any rule operating to delay the vesting of estates would lead to interminable confusion, and we think the established rule that, in the distribution or division of estates, values, as to all of the estate to be distributed after the death of the ancestor, and determined as of the date of his death, should be followed here. There would seem to be no other practical or safe rule open in the settlement of estates.

Establishing the value of the property of which Lewis Maxwell died seized and possessed at the sum of $245,-841.12, and adding to that the aggregate of the advancements to the ten children, $228,322.14, we have a total gross value and advancements of $474,163.26, from which we deduct the admitted net indebtedness of the estate, $137,-362.12, leaving a net value of the estate, including advancements, of $336,801.14. Now it is obvious that if there had been no advancements, or if the advancements had been equal, the estate should be distributed among ten heirs on the basis of $33,680.11 to each heir. However, the advancements were not equal. Including interest, and adopting the commissioner's report and the court's decree as correct, Edwin L. Maxwell received $61,512.51, J. Howard Maxwell, $47,394.48, and Isabelle M. Young, $39,861.97. Each of these amounts is above one-tenth of the net value of the estate, including advancements. No part of it is recoverable by the estate, because an advancement is irrevocable, no debt is created, and the heir receiving it is not required to refund it, or any part thereof. Therefore, the total of advancements to these three heirs, $148,768.96, must be deducted from the net value of the estate, leaving as the net value of the estate, including advancements, in which the seven heirs are entitled to participate, $188,-032.18, or $26,861.74 to each heir. The court affirmed the commissioner's findings, that inasmuch as advancements had been made to these seven children aggregating $79,-553.18, this amount should be deducted from the $188,032.18, leaving $108,479.00 as the net value of the estate to be dis-

tributed, and after adjusting the matter of $7,500.00 allowed to Everett W. Maxwell, as will be hereafter noted, the court decreed that said estate undistributed belonged to the following named children and heirs, and in the following proportion: Susie P. Kiger, 12.68%; Grace M. Gaylord, 15.77%; Mary E. Harper, 9.80%; Ruth Davies, 20.50%; Hugh J. Maxwell, 12.37%; Leeman Maxwell III, 20.60%; and E. W. Maxwell, 8.28%.

It will be observed that so far we have treated as correct the decree of the court fixing the amount properly chargeable against Isabelle M. Young at $39,861.97. We have heretofore indicated that as to the items entering into her account, we had no doubt except as to the one charge of $10,000.00, under date of February 15, 1930. Much can be said in support of the contention of Isabelle M. Young with respect to this one charge, that it was treated by Lewis Maxwell as the debt of her husband, yet, on the other hand, this sum was paid to her and by her transmitted to her husband. Presumably, under our decisions, it was an advancement to her. Whether the subsequent statements of Lewis Maxwell that he did not treat this as an advancement to his daughter rebut this presumption, we do not think necessary to decide, for the reason that, admitting her contention, she is still not entitled to further participate in her father's estate. The charge of $10,000.00 bore interest from the date of Lewis Maxwell's death, October 22, 1934, to December 22, 1937, and the amount as of the latter date, including interest, was $11,900.00. This deducted from the $39,861.97 charged against her leaves $27,961.97. On this basis, the total of all advancements would be reduced to $216,422.12; therefore, the net value of the estate, including advancements, would be reduced to $324,901.12, the total of the advancements to J. Howard Maxwell, Edwin L. Maxwell and Isabelle M. Young, or $136,868.96, being deducted, as they must be, for in the final analysis neither is entitled to further participate in the estate, would leave $188,032.18, the exact figure reached by the other calculation. Isabelle M. Young having received as an advancement at least $27,961.97, the value of

the estate to be distributed among eight heirs would necessarily have to be more than eight times the amount of her advancements to entitle her to further participate in the estate, and that amount is $223,695.76, or $35,663.58 in excess of the net value of the estate to be distributed among the seven heirs whom the court decreed to be entitled to further participate in the estate.

J. Howard Maxwell complains of the final decree because he says an excessive charge was made against him in fixing the value of certain lands conveyed to him by Lewis Maxwell, but he furnishes no testimony upon which we would be warranted in disturbing the decree on that ground. He also contends that while he received various funds from his father aggregating $8,435.09, they were received as loans, and that the statute of limitations, which he pleads, is a bar to the recovery thereof. The view of this case we take is that whatever these payments may have been called, they were in truth advancements, irrevocable in character; that no debt or obligation was created; and it necessarily follows that they are not subject to the statute of limitations. But even if the statute of limitations could be properly pleaded, J. Howard Maxwell could not participate in the estate for the same reason we have given with reference to the claim of Isabelle M. Young. In the first place, the advancements to J. Howard Maxwell are in excess of those to Isabelle M. Young, and the amount to which he claims the statute of limitations is pleaded is less than the amount of the alleged overcharge to Mrs. Young. Therefore, under no circumstances is J. Howard Maxwell entitled to participate in this estate. As to Edwin L. Maxwell, what has been said with relation to the statute of limitations in the discussion of J. Howard Maxwell's claims, applies, and the plea of the discharge in bankruptcy does not avail him, because he was never indebted to the estate of Lewis Maxwell in any sum, and there was nothing upon which the discharge in bankruptcy could operate. Having received advancements, he is only entitled to participate in the estate upon bringing into the estate the amount he has received, and in such a case, the discharge in bankruptcy has no application whatever.

The court decreed to Everett W. Maxwell the sum of $7,500.00 on account of permanent improvements alleged to have been made by him on lands of Lewis Maxwell prior to his death. It appears that some years ago, Lewis Maxwell placed Everett W. Maxwell in the possession of about 800 acres of land with what was thought to be an understanding that the land was to be conveyed by the father to the son. The land was not conveyed to the son and was appraised as part of the father's estate. The son treated the land as his own, made permanent improvements thereon in the way of erection of barns, fences and outhouses of different character, cleaning up the land and generally improving it. During this period he farmed the land and took to himself the profits from the operation of the farm. He furnishes a statement of expenditures of money in excess of $19,000.00 To carry on these improvements, he borrowed money from a bank in West Union for which his father indorsed his notes, and this is included in the indebtedness against the Lewis Maxwell estate. The commissioner, upon hearing the testimony on the question, which, to our mind, is very unsatisfactory, allowed Everett W. Maxwell $7,500.00 as a credit on the claim the estate would have against him were it to pay the notes in the West Union bank. The court affirmed this ruling of the commissioner, and the appellants complain of it on this appeal. We see no way by which the situation can be clarified or improved were we to remand the case for further development with respect to this claim. We cannot say that the court is plainly wrong in its actions, and the decree on this point will have to stand. If the commissioner was forced to make a compromise or guess upon this troublesome question, we have no assurance that a more equitable finding would result from a re-opening of the cause on this point.

We have endeavored to discuss all points fairly arising on the record, necessary to a decision of the cause, or which bear substantially upon the rights involved. On the whole, we see no error prejudicial to the appellants. While a higher valuation on the estate might have been justified

on the evidence, to reverse the cause on that ground would be merely to substitute our judgment for that of the commissioner and trial court on a disputed question of fact, a procedure which under many decisions of this Court we cannot follow. But even if we did follow that course, any increase in valuation, to be of benefit to the appellants, would reach a figure which we do not believe the evidence warrants. We think the evidence supports the decree on the amounts advanced to the several heirs by Lewis Maxwell, unless it be as to the charge of $10,000.00 in the account of Isabelle M. Young, and if there be error as to this (a point we do not decide), it is not, under the circumstances, prejudicial to her. Having upheld the trial court on the questions of valuation and amount of the several advancements, the ultimate result is merely a matter of calculation. In the case of *McClanahan* v. *McClanahan, supra,* considering a question of the weight of the evidence in a case of an advancement, this Court held:

> "This court will review the evidence, but, unless the same is clearly insufficient in any reasonable view of it to support the findings of the commissioner, will affirm the decree of the circuit court confirming such report."

We think the case at bar comes within this ruling.

The decree of the Circuit Court of Doddridge County is affirmed.

*Affirmed.*