L. M. LaFollette *v.* Cecil A. Croft *et al.*

(No. 9060)

Submitted October 15, 1940. Decided December 14, 1940.

728

*Blue, Dayton & Campbell,* for appellants.

*Rummel, Blagg & Stone, B. J. Pettigrew, J. W. Maxwell* and *Hutchinson, Crouse & Trail,* for appellees.

MAXWELL, JUDGE:

This appeal presents for review a decree of the Circuit Court of Boone County reforming an agreement of compromise settling conflicting claims of title to a tract of 52.5 acres of land in that county, and granting relief incident to the reformation.

The land in question, formerly owned by Anthony Lawson, was returned delinquent in the name of Lawson's heirs for non-payment of taxes for the years 1897 and 1898. Pursuant to this delinquency, the land was sold by the sheriff of Boone County in January, 1900, to S. E. Bradley who in due course obtained a deed pursuant to the purchase, and in April, 1904, conveyed the tract to L. M. LaFollette, in whose name the land has subsequently been carried on the tax books, all accruing taxes being paid by him.

Under date of March 25, 1918, he executed to Ohio Cities Gas Company, now Pure Oil Company, an oil and gas lease on this land. The lease provided for customary royalty of one-eighth of the oil produced, and appropriate royalties for both casing-head gas and volume gas. On the same day that the lease was executed and delivered, the lessor and lessee entered into a supplemental

agreement, denominated on its face as "part and parcel of said lease" whereby the lessee covenanted to account to the lessor for an additional one-eighth royalty of oil from any well on the premises which would produce in excess of thirty barrels of oil per day "at the end of thirty days after same is shot." With reasonable promptitude after acquiring the lease of March, 1918, the lessee entered upon the land, made a location and proceeded in the drilling of a well. When the well was far toward completion operations were suspended by the lessee immediately on receiving a notice from Cecil A. Croft under date of November 25, 1918, wherein he asserted ownership of the tract of 52.5 acres, and informed the lessee that he would treat its agents and employees as trespassers if they were later found on the land for any purpose other than to remove the lessee's property which had been placed there in connection with the drilling operations. Croft's assertion of title to the land was grounded on a quitclaim deed therefor which he acquired September 16, 1918, from Lawson Heirs Holding Company, a corporation, grantee of the heirs of Anthony Lawson, deceased, under deed of June 20, 1913. Also, he challenged the sufficiency of LaFollette's tax title.

Thereafter conferences were had between LaFollette and Croft in effort to compromise their conflicting claims of title to the land. These efforts were consummated in a formal written agreement executed by them March 20, 1919. Ohio Cities Gas Company also was a party signatory to that agreement. By the terms of the compromise, Croft released and quitclaimed unto LaFollette any and all interest he (Croft) might have in the land, and confirmed unto the gas company the lease which LaFollette had executed to it March 25, 1918, "but, subject however, to a reservation (to Croft) of three sixty-fourths (3/64) royalty interest in all the oil produced, or to be produced from said fifty-two acres of land under the said lease to the Ohio Cities Gas Company, or any other lease for oil hereafter made on said land * * *." Further, by the agreement LaFollette con-

firmed the "reservation" of oil to Croft, and the gas company agreed to operate with due diligence.

Promptly after the execution of the compromise agreement, the lessee resumed work on well No. 1, operations whereon had been suspended, and soon completed the well by bringing in a substantial production of oil. Both the first well and subsequent ones drilled on the land produced oil in sufficient quantities to entitle LaFollette to the additional one-eighth oil royalty provided for in his supplemental agreement with the lessee, entered into on the same day the lease was executed, March 25, 1918.

This litigation was bgun by LaFollette in 1931 by the filing of a bill against Croft and associates to recover approximately one thousand dollars, with interest, which amount LaFollette claimed was owing to him by the defendants to the bill on account of taxes which had accrued on the property subsequent to the compromise of 1919, all of which taxes had been paid by LaFollette. That tax-recovery question is no longer involved in the suit. The paramount controversy was precipitated by a cross-bill filed in the case by Croft and associates. The associates of Croft came into the matter, so far as LaFollette is concerned, subsequent to the execution of the compromise agreement, so, further in this opinion reference will be made to Croft, and not to Croft and associates. On the other side reference will be made solely to LaFollette without reference to his associates, they, also, having become interested since the compromise.

In the cross-bill Croft alleges that the true agreement between LaFollette and himself was that he should have three-eighths of all royalties, rentals and income to be derived from the leasing and operating of the land for oil and gas purposes; that he, not knowing of the supplemental agreement between LaFollette and the lessee, and assuming that LaFollette was entitled to receive from the lessee only one-eighth oil royalty as recited in the lease, accepted the wording of the compromise agreement placing in him the ownership of three sixty-fourths royalty interest in all the oil produced from the property; that

he was deceived by "the artful wording of said agreement and the fraudulent concealment of the fact and existence of the secret supplemental agreement" between LaFollette and the lessee providing that LaFollette should have an additional one-eighth oil royalty. He concludes the cross-bill by praying that the compromise agreement of March 20, 1919, be reformed and corrected in accordance with the intention of the parties as alleged in the cross-bill, and that LaFollette be required to account to Croft in accordance with the requirements of the compromise agreement as reformed. The equitable ground invoked is fraud.

By reply to the cross-bill LaFollette denied that the agreement between him and Croft was that the latter should have three-eighths of all royalties, rentals and income, but that, as set forth in the writing of March 20, 1919, the true agreement was that Croft should have three sixty-fourths royalty interest in the oil produced, or to be produced, from the 52.5 acres of land. LaFollette denies that there was any artful wording in the contract.

The circuit court, by decree rendered November 13, 1939, sustained the contention of Croft, and entered a decree reforming the written compromise agreement of March 20, 1919, so as to sustain in Croft "a reservation of three-eighths (3/8) part of all royalties, rentals and income arising from the oil, casing-head gas and natural gas produced from said 52 acres of land under the said lease to the Ohio Cities Gas Company, or any other lease for oil, gas and casing-head gas hereafter made on said land * * *", and referred the cause to commissioners in chancery for the purpose of ascertaining and reporting the extent of the accounting which should be required of LaFollette in accordance with the terms of the compromise agreement as modified by the court's decree.

The foregoing statement is synoptical of what are believed to be the essential features of the record. Croft and LaFollette, in their extended testimony respecting the negotiations between them preliminary to the execution of the compromise agreement, flatly contradict each

other on most every point which arose in the taking of the depositions. For each it is argued that his version is logical and probable. The veracity of each is brought in question. Though the finding of the trial chancellor would indicate that he accepted Croft's version concerning the dispute between Croft and LaFollette about the negotiations leading up to the written contract, we cannot give that finding of the trial court dominating effect, because of other elements which we deem controlling, and which necessitate a different conclusion from that reached in the trial court. And for the same reason we do not consider it necessary to enter upon a minute discussion of the testimony concerning conferences and events backgrounding the execution of the compromise agreement. The other elements just mentioned involve mixed questions of law and fact.

In our opinion, the controlling propositions of this case are these, and they are briefly stated as follows:

First: Croft and LaFollette dealt at arm's length. There was no fiduciary relationship between them. The antithesis of such situation had developed—acute hostility was the actuality. In no sense were they joint adventurers in an oil and gas development project, but merely and strictly antagonistic claimants of title to a tract of land. By their compromise agreement the thing they undertook to settle was Croft's claim of title. Against LaFollette's title, many years after he had received a tax deed, and after he had executed an oil and gas lease whereunder operations were proceeding, Croft launched an attack. For a sufficient consideration he stood ready to release and quitclaim any title he might have as basis for the attack. LaFollette was willing to buy peace, and, despite the hostility and bad feeling between them, a price was agreed. Instead of that price being defined in a stated number of dollars, it was related in a definite fractional amount of oil, hoped to be produced from the land. Croft sold his title-claim on that basis. LaFollette bought it. Since this was essentially the ground of their negotiations, Croft had no real concern with respect to any

arrangement, advantageous to LaFollette, theretofore or thereafter made between LaFollette and his lessee. Passive silence by LaFollette was not a fraud. *Pennybacker* v. *Laidley,* 33 W. Va. 624, 11 S. E. 39. As to Croft, the supplemental arrangement between LaFollette and the lessee, was *res inter alios acta.* That being the background, LaFollette was under no obligation to inform his antagonist that if heavy oil production were realized LaFollette would receive a larger share of the oil than is ordinarily accorded to a lessor of oil producing property. That was LaFollette's business, not Croft's. There being no relationship of trust and confidence between the parties, LaFollette was not required to disclose all he knew about the property. He was paying Croft, in oil, if and when produced, a fixed price to step aside as to claim of title. Croft accepted the price. There the matter was concluded. The discussion of these propositions proceeds in conformity and conjunction with the second of the controlling elements herein above mentioned:

Second: The negotiations between Croft and LaFollette led to, and were merged in, the written instrument of March 20, 1919, duly executed by them. It became the formal repository of their agreement, and the emphatic evidence thereof. It must remain as written, and its terms must be complied with by the parties thereto, unless, on equitable grounds, it should be reformed or cancelled. Of course, fraud is such equitable ground. *Tolley* v. *Poteet,* 62 W. Va. 231, 57 S. E. 811. Fraud is a blight which will afford basis for reformation or cancellation of any instrument it contaminates. But fraud involves a charge of grave seriousness, and can be sustained only on full proof. *Hunt* v. *Hunt,* 91 W. Va. 685, 114 S. E. 283. In vain do we look for that degree of proof in this case. Already we have shown that LaFollette was not under obligation voluntarily to disclose to Croft that there was a supplemental contract between LaFollette and the lessee; and in respect of Croft's testimony that LaFollette, in the course of their conferences, told Croft, or, at least through active concealment, created the im-

pression on the latter's mind, that the lease providing for one-eighth oil royalty was the full contract between the lessor and the operating company, LaFollette enters emphatic denial in every detail. On this stalemate in their testimony, reference may pertinently be made to the legal presumption of innocence and honesty to which every person is entitled until the contrary be proved. *Hord's Adm'r.* v. *Colbert,* 28 Gratt. 49. Whence, therefore, comes the proof of active fraud by LaFollette? It cannot be assumed or presumed. There is introduced by Croft much testimony respecting collateral circumstances, but they rest solely on inference and fail to point out any untruth uttered by LaFollette to Croft concerning the lease. Even among strangers there must be no falsehoods in the bringing about of a contract between them. But here, the evidence of falsifications is lacking.

A decree determining a question of fact will be reversed where it is against the weight of the evidence. *Blue* v. *Glass Co.,* 106 W. Va. 642, 147 S. E. 22. *Purcell* v. *Robertson,* 122 W. Va. 287, 8 S. E. (2d) 881.

We are of opinion that the record does not establish any sufficient ground for reformation of the compromise agreement of March 20, 1919. Consequently, we reverse the decree of November 13, 1939, and, proceeding to render such decree as in our opinion the trial chancellor should have rendered, we dismiss the cross-bill and award costs to LaFollette.

*Reversed and rendered.*

KENNA, PRESIDENT, dissenting:

Judge Fox and I respectfully dissent for reasons that could be stated at length, but we believe may be sufficiently covered by saying that we think the trial chancellor in this instance where both the credibility of witnesses and the weight to be accorded to conflicting testimony are the determinative elements, should be regarded as the final judge.

We think the majority mistakenly viewed this contro-

versy as representing "clearly and strictly antagonistic claimants of title to a tract of land." Croft was not mainly interested in the land. Neither was LaFollette. It was the oil and gas subject to the lease then in effect in a territory being quickly developed that absorbed the interest of both. Equity regards the substance rather than the form. That seems quite obvious.

From a practical standpoint, to have jeopardized the binding effect of the lease to Pure Oil Company would likely have been costly to both of them. Confirmation of the lease under the circumstances left them nothing of considerable value over which to negotiate except the royalty. Croft testified that LaFollette showed him a recorded lease, but did not reveal to him the fact that the royalty was increased by an unrecorded supplemental paper that by its terms was expressly made a part of the lease. The majority opinion takes the position that Croft and LaFollette were dealing at arm's length and therefore LaFollette was under no duty to disclose fully. We do not understand that that was the theory upon which LaFollette submitted his case. To the contrary, his principal contention was that when the compromise agreement was entered into, Croft was fully informed as to the actual amount of royalty, or that shortly thereafter he became so informed by reason of a division order sent to LaFollette and him, stating plainly that the lease provided for a one-fourth royalty. As we read this testimony, LaFollette's defense was based upon the theory that Croft knew of the supplemental agreement when the compromise agreement was executed in 1919, or shortly thereafter acquired that knowledge, and due to his asquiescence since then is now estopped. Under these circumstances, and with this conflict, we believe the trial chancellor was amply justified in his finding of fact. LaFollette nowhere admits his failure to fully disclose and contends that that course of conduct was justified by the fact that he and Croft were dealing at arm's length.

Nor do we agree that it is the duty of this Court to weigh the evidence in a chancery cause in the manner

indicated by the third point of the syllabus, but we think the finding of fact must be *clearly* wrong in order to warrant disturbing it upon appeal. The second point of the syllabus in the case of *Purcell* v. *Robertson*, 122 W. Va. 287, 8 S. E. (2d) 381, reads as follows: "While an appellate court is reluctant to disturb a finding of fact of a trial chancellor on conflicting evidence, such finding will be reversed where it clearly appears to be against the weight and preponderance of the evidence." The majority opinion speaks of this cause having been submitted "on this stalemate in their testimony." Croft and LaFollette were the only material witnesses concerning the negotiations, so that if their statements under oath amounted to a draw, there was no clear preponderance, and the trial chancellor's decree should have been affirmed, according to the plain statements of this Court, readily accessible in the following cases: *Smith* v. *Yoke,* 27 W. Va. 639; *Wolfe* v. *Second Natl. Bank of Parkersburg,* 54 W. Va. 689, 47 S. E. 243; *McCraw* v. *Bower,* 62 W. Va. 417, 59 S. E. 175; *Matney* v. *Blakely,* 97 W. Va. 291, 124 S. E. 918; *Straton* v. *Aldridge,* 121 W. Va. 691, 6 S. E. (2d) 222; *Buskirk* v. *Bankers Finance Corp.,* 121 W. Va. 361, 3 S. E. (2d) 450; *Wm. C. Atwater & Company, Inc.* v. *Fall River, etc., Co.,* 119 W. Va. 549, 195 S. E. 99; *Richardson* v. *Ralphsnyder,* 40 W. Va. 15, 20 S. E. 854; *Weaver* v. *Akin,* 48 W. Va. 456, 37 S. E. 600.