*In Re:* SETTLEMENT OF ACCOUNTS OF ED L. BOGGS,
*Administrator of the* ESTATE OF J. M. BOGGS, *Deceased.*

(No. 10266)

Submitted January 23, 1951.   Decided February 6, 1951.

290

Fox, JUDGE, not participating.

*Eakle & Eakle,* for plaintiff in error.

*Cary C. Hines, Henry N. McLane,* for defendant in error.

RILEY, JUDGE:

This writ of error was awarded on the petition of Ed L. Boggs, administrator of the estate of J. M. Boggs, de-

ceased, and "as Agent and Trustee of the Beneficiaries of said estate", to the judgment of the Circuit Court of Clay County, rendered on June 6, 1949, in the matter of the settlement of the accounts of Ed L. Boggs, administrator, in so far as Harry M. Boggs, hereinafter referred to as "H. M. Boggs", one of the heirs and distributees of J. M. Boggs, deceased, is concerned. The circuit court over-ruled the exceptions of Ed L. Boggs, administrator of the estate of J. M. Boggs, deceased, to the county court's order of December 6, 1948, in each particular, and sustained certain of the exceptions of H. M. Boggs.

The order of the County Court of Clay County, entered on December 6, 1948, upon agreement of counsel, corrected an apparent error of the commissioner's report of interest due on $2,000.00 of indebtedness from H. M. Boggs to decedent's estate for certain lands purchased by H. M. Boggs from decedent, from $1,867.13 to the corrected amount of $1,451.18, after deducting $148.45, costs recovered by said H. M. Boggs in the circuit court and in this Court in the case of Boggs v. Boggs, 125 W. Va. 600, 25 S. E. 2d 631, instead of $187.13. The county court also overruled all other exceptions to the commissioner's report of Ed L. Boggs as "Administrator, Agent and Trustee" and H. M. Boggs, and except as to the correction of the indebtedness of H. M. Boggs to the decedent's estate, the order of the County Court of Clay County ratified and confirmed the commissioner's report.

The report of the commissioner took cognizance, as the basis of settlement, of a contract dated October 26, 1938, between all of the twelve heirs and distributees of J. M. Boggs, deceased, including Ed L. Boggs, in his own right, parties of the first part, and Ed L. Boggs, administrator of the estate, party of the second part. The latter, though named in the premises of the contract, did not sign the same..

Likewise the circuit court in its final order of June 6, 1949, ordered that the administration of the estate of J. M. Boggs, deceased, in the hands of Ed L. Boggs, adminis-

trator, shall be subject to the agreement of the several heirs, dated October 26, 1938, wherein advancements to each heir, whether in real estate or money, are to be charged upon the patrimony of each heir on the basis of the distribution of the funds in the hands of, or coming into the hands of, the administrator to equalize the inheritance of all of the heirs; and partially on the basis of that contract the circuit court decreed the following advancements: "Sabina Mealy, $5,200.00; Mary S. Hyer, $4,500.00; J. B. Boggs, $7,000.00; Guy Boggs, $4,000.00; Katie Ball, $4,000.00; Fred Boggs, $6,500.00; Ed L. Boggs, $5,000.00; E. A. Boggs, $3,000.00; A. S. Boggs, $5,200.00; Ella Pembroke, $11,000.00, and H. M. Boggs, $7,333.84."

In addition the circuit court ordered that the advancement made to A. S. Boggs, as set forth in the contract, should be reduced to the extent of $1,600.00, and should, therefore, be fixed at $5,200.00, instead of $6,800.00, as set forth in the contract, and that the advancements made to H. M. Boggs should be increased to the extent of the interest on the purchase money note of $2,000.00, dated February 2, 1933, and paid, less interest, on July 7, 1943, the gross interest amounting to $1,450.25, subject to the diminution of $216.41, leaving the sum of $1,233.84, as the proper charge against the estate of H. M. Boggs, "which added to his unit of distribution as fixed by the terms of the agreement, that is, $6,100.00, aggregates the sum of $7,333.84, of which sum, it is adjudged, ordered and decreed, the distribution of the funds, in the hands of the administrator, should have heretofore proceeded, and hereafter shall proceed, in equalizing the inheritance of the said H. M. Boggs with the other heirs according to the tenor of the agreement of October 12, [26] 1938, aforesaid, as heretofore herein revised and so decreed."

In the final order the circuit court sustained the exceptions of H. M. Boggs to the compensation and commissions claimed by Ed L. Boggs, administrator, and allowed by the commissioner of accounts, and by the county court, in the amounts of $2,500.00 and $1,264.96, respectively,

aggregating $3,764.76 ($3,764.96); that the said sum of $3,764.76 be restored by the administrator to the active funds in his hands as such administrator; and that he be charged therewith as funds available for distribution among the heirs, as their rights may appear. On this basis the circuit court ordered that the balance in the hands of the administrator, found by the commissioner as $2,428.50, be corrected accordingly, and that said balance be adjudged to be $6,193.26.

Initially, this Court is concerned with two questions of jurisdiction, not raised by counsel, but nevertheless appearing in this record: (1) Is the writ of error from the Circuit Court of Clay County in that it is prosecuted to this Court more than four, but less than eight months from the final order of the circuit court improvidently awarded; and (2) has a county court, under Article VIII, Section 24 of the West Virginia Constitution, the power to pass on the question presented by this record, for, if that court has no such power, the Circuit Court of Clay County likewise would be without power to entertain the writ of error? Although these questions of jurisdiction have not been raised by counsel for any of the parties interested, this Court, on its own motion, may and should take notice of the lack of jurisdiction, if such exists, at any stage of the litigation, and at any time the same appears. *Page* v. *Huddleston,* 98 W. Va. 104, 126 S. E. 579; *Commonwealth* v. *Lorillard,* 129 Va. 74, 105 S. E. 683; *Thacker* v. *Hubard,* 122 Va. 379, 94 S. E. 929.

While the writ of error to this Court from the judgment of the Circuit Court of Clay County was more than four months and less than eight from the rendition thereof, we are of the opinion that the writ of error was timely. We say this because the writ of error was to a judgment of the circuit court on an "appeal" from the county court, as distinguished from a judgment of the circuit court on an "appeal" from a court of limited jurisdiction. Code, 58-4-7, dealing with "appeals" from courts of record of limited jurisdiction provides that a petition to this Court must be presented within four months from

the date of the judgment, decree or order of the circuit court; and such was the holding of this Court in *State* v. *Davidson,* 134 W. Va. 328, 59 S. E. 2d 469.

On the other hand, Code, 58-3-4, which deals with "Appeals from County Courts" provides for an appeal from an order of the county court to the circuit court upon a petition presented within four months after "such judgment, order or proceeding was rendered, had or made * * *"; and, further, under Code, 58-3-6, if such application be refused by the circuit court, application may be made to the Supreme Court of Appeals, and the refusal shall be endorsed on the petition, which, together with the original record may then be presented to this Court, or a judge thereof in vacation. This last-mentioned section, however, makes no mention as to the time within which such presentation to this Court must be made.

As the provisions of Chapter 58 of the Code, entitled "Appeal and Error" deal separately in Article 3 with "Appeals from County Courts"; in Article 4 with "Appeals from Courts of Record of Limited Jurisdiction"; and in Article 5 with "Appellate Relief in Supreme Court of Appeals", we are of opinion that the four-months time limitation for appeals from courts of limited jurisdiction to this Court, provided in Code, 58-4-7, does not apply, and, therefore, the general time limitation of eight months, provided for in Code, 58-5-4, for application to this Court for writs of error and appeals, controls in this case. Section 1 of Article 5, provides for an appeal from, or writ of error, or supersedeas to, a judgment, decree or order of a circuit court "In civil cases where the matter in controversy, exclusive of costs, is of greater value or amount than one hundred dollars, wherein there is a final judgment, decree or order * * *." Section 2 provides for the certification to this Court of the rulings of a circuit court on the sufficiency of a summons, return of service or pleading. Code, 58-5-3, provides that "Any person who is a party to such controversy [meaning the controversy embraced in Code, 58-5-1], wishing to obtain a writ of error, appeal or supersedeas in the cases named in the

first section of this article, may present a petition therefor * * *" to this Court, or a judge thereof in vacation. And Code, 58-5-4, provides: "No petition shall be presented for an appeal from, or writ of error or supersedeas to, any judgment, decree or order * * *, which shall have been rendered or made more than eight months before such petition is presented."

Thus it can be seen that Article 5 of Chapter 58, of the Code, except as otherwise provided by Code, 58-4, is intended to cover all applications to this Court for a writ of error, appeal or supersedeas, or the docketing of the certificate of a circuit court on the sufficiency of a summons, return of service or pleading; and that the instant proceeding, being a controversy within the meaning of Code, 58-5-1, which provides for "Appellate Relief in Supreme Court of Appeals", and said Article 5 providing only for an eight-months time limitation for applications to this Court, the writ of error to this Court, having been applied for within eight months from the entry of the final order of the Circuit Court of Clay County, was timely awarded.

The second question of jurisdiction of this Court and the Circuit Court of Clay County should be raised by this Court *ex mero motu,* because of the many decisions of this Court involving the powers of county courts under Section 24, Article VIII of the Constitution, to pass on questions, which are clearly within the constitutional delegation of power to those courts. So, in the consideration of this case on the immediate jurisdictional question, let us now consider some of the decisions written through many years, involving the power of county courts to pass on certain questions.

In *Hawley* v. *Falland,* 118 W. Va. 59, 188 S. E. 759, this Court held that a county court had no power under Section 24, Article VIII of the West Virginia Constitution, to adjudicate or determine an attorney's lien. *In re Brown's Estate,* 123 W. Va. 504, 16 S. E. 2d 801, a case in which a county court was required to construe a deed, this Court

held, in point 1 of the syllabus, that county courts were without jurisdiction to construe deeds, contracts and wills. In *Steber* v. *Combs*, 121 W. Va. 509, pt. 3 syl., 5 S. E. 2d 420, it was held that a commissioner of accounts had no jurisdiction to settle conflicting claims to a decedent's estate. *In re Estate of Long, deceased*, 122 W. Va. 473, 10 S. E. 2d 791, point 2 of the syllabus, this Court modified the third point of the syllabus in the *Steber* case to read that "Under West Virginia Constitution, Article VIII, Section 24, withholding from courts of probate the power to adjudicate judicial questions other than those specifically enumerated therein, a commissioner of accounts has no jurisdiction to settle conflicting claims to a decedent's estate." In that case the claimant was not a creditor of the estate, and her claim was not a debt against the estate within the provisions of Code, 44-2: she simply retained certificates of deposit, and this Court held that if the certificates were wrongfully retained, the administrator would have a right of action in detinue for their recovery. In *Johnson* v. *National Exchange Bank*, 124 W. Va. 157, 162, syl., 19 S. E. 2d 441, this Court held that where securities were allegedly wrongfully converted by decedent to his own use, the actions of assumpsit and trover were available to the administrator; and the County Court of Ohio County had no jurisdiction to adjudicate that claim. In *Stone* v. *Simmons*, 56 W. Va. 88, 48 S. E. 841, it was held that a court of equity had no jurisdiction by injunction to restrain the settlement of an estate by a county court, the holding being based on the ground that under Section 24, Article VIII of the Constitution "county courts, and the clerks thereof, in vacation, have exclusive original jurisdiction in all probate matters involving the probate of wills and the ordinary administrative proceedings involved in the administration of estates." Pt. 2 syl. in *In Re Estate of John T. Gilbert, deceased*, 115 W. Va. 599, 177 S. E. 529, it was held in the syllabus inferentially that a county court had jurisdiction to adjudicate the claim of a child to compensation from the estate of a parent for services rendered and support furnished by the former to the latter, without proof of an express con-

tract "where it may be reasonably inferred, or implied, from the established facts and circumstances that pecuniary compensation was in the view of the parties at the time such services were rendered and support furnished." And again the powers of county courts under Section 24, Article VIII of the Constitution, were considered and appraised by this Court in *Boone and Boone* v. *Boone,* 123 W. Va. 696, pt. 3, syl., 17 S. E. 2d 790; and *Gapp* v. *Gapp,* 126 W. Va. 874, 30 S. E. 2d 530. For an early discussion of the powers of county courts under Section 24, Article VIII of the Constitution, see the opinion of Judge Green in *Dower* v. *Seeds,* 28 W. Va. 113, 153-156.

From a careful consideration of the foregoing West Virginia cases, we are of opinion that this Court has held that county courts have no jurisdiction under Section 24, Article VIII of the Constitution, where the matters adjudicated by that court are collateral to the probate of a will, the appointment of a fiduciary, and the settlement of a fiduciary's accounts. In the instant case, however, we believe the County Court of Clay County had jurisdiction to adjudicate the alleged advancements which J. M. Boggs made to his twelve children. As held in the case of *In Re Long, supra,* county courts have unlimited jurisdiction within the scope of the powers delegated to those courts under Section 24, Article VIII of the Constitution. There is no question in this case involving the construction of the contract, nor is there any adjudication required as to the devolution of the estate of J. M. Boggs under the laws of intestacy. But in this case, the County Court of Clay County was required, as it was empowered to do under Section 24, Article VIII of the Constitution, to determine the distributive share each of the twelve children of J. M. Boggs was entitled to receive under the laws of intestacy. Such duty devolved on the county court as incident to the settlement of the estate of J. M. Boggs, and in the determination of the distributive share of each of the twelve children of J. M. Boggs it was necessary to determine the advancement received by each. In the case of *In re Estate of J. W. Groves, Administrator,* 120

W. Va. 373, 198 S. E. 142, without expressly passing on the question of jurisdiction in the case immediately before it, this Court, on writ of error to a judgment of the Circuit Court of Nicholas County, in approving the action of the county court of that county, in the settlement of decedent's estate, held in point 1 syllabus that: "A gift made by a parent to his child, calculated to advance the latter in life, is *prima facie* an advancement." The *Groves* case, except for the fact that the alleged advancements were not stated in a written contract, as in the instant case, is fully in point with this case on the question of the jurisdiction of county courts to adjudicate the question of advancements alleged to have been received by distributees of a decedent's estate, where the question, as here, does not involve the construction of a will, contract or deed.

In the appraisement of the instant case it may be well to set forth the pertinent provisions of the contract of October 26, 1938, between all the heirs of J. M. Boggs, deceased, and the administrator. Though the contract was signed by all the heirs as follows: J. B. Boggs, Mary S. Hyer, Andrew S. Boggs, Guy Boggs, E. A. Boggs, C. A. Boggs, Katie Ball, Ed L. Boggs, Ella B. Pembroke, Fred Boggs, H. M. Boggs, and Sabina C. Mealy, it was not signed by Ed L. Boggs as administrator. The contract, however, sets forth various pieces of real estate and sums of money which each of the distributees of J. M. Boggs, deceased, received and should be charged with as advancements, as follows:

| Name | Real Est. | Money, etc. | Total |
|---|---|---|---|
| Sabina C. Mealy | | | 5200.00 |
| Mary S. Hyer | $2500.00 | $2000.00 | 4500.00 |
| J. B. Boggs | 2500.00 | (2500.00) | |
| | | (2500.00) | 7000.00 |
| Guy Boggs | 3000.00 | 1000.00 | 4000.00 |
| Katie Ball | 3000.00 | 1000.00 | 4000.00 |
| Fred Boggs | 2500.00 | (2000.00) | |
| | | (2000.00) | 6500.00 |
| Ed L. Boggs | 2500.00 | 2000.00 | 5000.00 |
| E. A. Boggs | 3000.00 | | 3000.00 |

| | | | |
|---|---|---|---|
| A. S. Boggs, Land | 1800.00 | (1800.00 | |
| Paid Hospital | | (2000.00) | |
| | | 3000.00 | 6800.00 |
| Ella Pembroke | 10000.00 | 1000.00 | 11000.00 |
| H. M. Boggs, Land | 2000.00 | | |
| Timber | 3000.00 | | |
| ½ interest store | 950.00 | 1100.00 | 6100.00 |
| C. A. Boggs | 3000.00 | | 3000.00 |

The contract further provides "it is mutually agreed between the several parties of the first part and said second part that he shall disburse the money so now in his hands as well as all other sums of money which may hereafter come into his hands as such *person* representative, to the parties of the first part severally to the end that it will make the amounts so already advanced by said J. M. Boggs and now to be disbursed by second party, as nearly equal as possible among the several parties of the first part."

The questions which seem to be before this Court are as follows: (1) Whether the sum charged by the circuit court to H. M. Boggs in the amount of $7,333.84 is proper; (2) whether the circuit court was justified in overruling the order of the county court in affirming the commissioner's report that the said Ed L. Boggs, administrator, should be allowed the sum of $2,500.00 and $1,264.96, respectively, aggregating $3,764.76 ($3,764.96), and in decreeing that said sum of $3,764.76 be restored by the administrator to the active funds in his hands as such administrator, and upon such restoration there was adjudged to be a balance in the hands of the administrator of $6,193.26; and (3) whether the circuit court was justified in reducing the amount of advancements to A. S. Boggs to the extent of $1,600.00, from $6,800.00 to $5,200.00.

In consideration of the questions before us, we suggest that the record is so meager that it is quite difficult for this Court to appraise the factual issues before us.

Addressing ourselves to the first question: Whether the Circuit Court of Clay County properly decreed the ad-

vancement of $7,333.84, as chargeable against H. M. Boggs, it is to be noted that in the contract of October 26, 1938, H. M. Boggs admitted that he was chargeable with the sum of $6,100.00, comprised as follows: land, $2,000.00; timber, $3,000.00; and money, $1,100.00. This contract, under H. M. Boggs' name, states an item of "½ interest store · $950"-"$1,100". Evidently, the last-mentioned item in- cluded the first-mentioned amount of $950.00, as the total amount which H. M. Boggs admits he should be charged with in the contract of October 26, 1938; and, as the record discloses, the $1,100.00 item set forth in the contract· was the total amount advanced by J. M. Boggs to pay for the store of H. M. Boggs.

Several things should be explained with reference to the account of H. M. Boggs with the estate of his father, J. M. Boggs. In the first place the sum of $2,000.00, set forth in the contract under the item "Land", was evident- ly given to H. M. Boggs in 1912. Between the execution of the contract of October 26, 1938, and the first distribu- tion of the proceeds of deceased's estate in his hands, the administrator, Ed L. Boggs, came into possession of a letter dated January 4, 1906, addressed at Big Otter, West Virginia, and written by J. M. Boggs to W. R. Mealy, the husband of decedent's daughter, Sabina C. Mealy, at Mor- gantown, West Virginia, which stated, among other things, "* * * I furnished Harry [H. M. Boggs] $3150,—over and above his advancement of $5,000,". It is on the basis of this letter that the administrator, Ed L. Boggs, claims that his brother, H. M. Boggs, in stating in the contract that his total advancements from his father, J. M. Boggs, were $6,100.00, made a misstatment in that regard; and that in no event should the amount chargeable to H. M. Boggs be less than the sum of $8,150.00, as shown by the letter of January 4, 1906, in addition to the $2,000.00 for the land or homeplace, in which H. M. Boggs now lives at Ivydale, West Virginia; and that this amount is in addi- tion to the indebtedness which the administrator claims H. M. Boggs owes to the estate of J. M. Boggs, deceased, in the amount of $1,233.84, being the gross amount of in-

terest in the amount of $1,450.25 on the $2,000.00 indebtedness paid by H. M. Boggs to decedent's estate, less $216.41, the last amount being the costs decreed to H. M. Boggs in the case of *Boggs* v. *Boggs, supra*. In effecting his various settlements, the administrator, considering that Ella Pembroke received an advancement of $11,000.00, and taking H. M. Boggs' advancement at $8,150.00, sought to equalize the payments in his settlement of September 13, 1945, the distributions ranging from $2,400.00 to $6,400.00. On the two supplemental distributions the ten children received another $1,000.00 each.

What is the effect of H. M. Boggs' misrepresentation in the agreement of October 26, 1938? The answer to this question lies in the determination whether the fraud is in the factum of the agreement or in the inducement thereof. Generally, fraud in the factum of a contract, as distinguished from fraud in the inducement, renders the contract void and not voidable. Thus fraud in the identity or existence of the subject matter of a contract renders the contract void. 1 Page on the Law of Contracts, Section 224. So, "Fraud as to an essential element of a contract exists where one party thereto intentionally misleads the other as to one of the elements of the contract into which they are entering. A fraudulent representation as to the identity of the subject matter, as where * * * [fraud exists relative] to the character and value of the timber upon a tract of land, even if the vendee did not take advantage of an opportunity to inspect it * * * prevents the contract from being valid." 1 Page on the Law of Contracts, Section 224; *Brannen* v. *Brannen*, 135 Ga. 590, 69 S. E. 1079. A notable exception to this rule that where the fraud is in the factum of the contract it is void, is in a case where provisions have been inserted in the contract by fraud, the contract is regarded as voidable rather than void. 1 Page on the Law of Contracts, Section 238. However, "The commonest form of fraud in the factum exists where an instrument in writing is drawn up and signed by one party under a false belief as to its contents, due to the fraud of the adversary party. In such

case the contract is generally held to be void." 1 Page on the Law of Contracts, Section 229, and cases cited under note 1, including *Ballouz* v. *Higgins*, 61 W. Va. 68, 56 S. E. 184; *Acme Food Co.* v. *Older*, 64 W. Va. 255, 61 S. E. 235. The last-mentioned case is clearly one of fraud in the factum, in which this Court, speaking through Judge Poffenbarger, held that a note, the signature to which was fraudulently procured is void, there being in that case a substitution of papers presented to the payee maker for signature. At page 277 of the opinion, this Court said: "If the signature to the paper as a note was fraudulently procured, the paper is not, in law, a note, although signed and apparently one." A typical case in which the fraud is in the inducement and not in the factum is that of *Coffman* v. *Viquesney*, 76 W. Va. 84, 84 S. E. 1069, in which the Court held in point 3 of the syllabus: "A contract fraudulently procured is not void, but only voidable, and the party complaining may elect to repudiate it or to be bound by it. He has but one election, and if he elects to be bound, after knowledge of the fraud, he is thereby concluded." The fraud charged in that case was based upon alleged misrepresentation as to the value of the stock of a corporation, and clearly the fraud was in the inducement of the contract.

Notwithstanding there has been a great deal of confusion in the cases due to the inept use of the words "void", "voidable", and "invalid", in relation to contracts alleged to have been vitiated because of fraud, (12 Am. Jur., Contracts, Section 10) nevertheless, there is a clear distinction between fraud in the factum of an agreement and in the inducement and the effect thereof. 1 Black on Rescission and Cancellation, 2d Ed., Section 21. See generally Kerr on Fraud and Mistake, Am. Ed., 1882, pages 50, and 51; Smith, The Law of Frauds and The Statute of Frauds, 1907, Section 147.

This case, in our opinion, involves an agreement, in which the fraud is in the factum and not in the inducement. The inducement which prompted the twelve children of the decedent, J. M. Boggs, to enter into the con-

tract of October 26, 1938, so that each of the said children would fully disclose and put into the contract the amount of advancements made to him or her by their father from 1896 until the time of his death. The numbers and amounts of these advancements were peculiarly within the knowledge of each of the parties receiving them. These brothers and sisters were not dealing at arms' length, as were the parties in the case of *LaFollette* v. *Croft,* 122 W. Va. 727, 14 S. E. 2d 917, in which this Court held that there could be no reformation or rescission of a contract which is otherwise unimpeachable "Where parties to a contract, hostile to each other because of antagonistic interests involved, deal at arm's length, there being no confidential relation and no positive misrepresentations nor active concealment of facts" but mere passive silence by one of the parties.

The purpose underlying the inducement to the instant contract was laudable indeed, and in furtherance of their father's immutable intention in the distribution of his properties during his lifetime to do equity among all of his children, an intention testified to in this record by Ed L. Boggs and expressed by decedent for the first time in a number of deeds of land to his children, which he executed in 1896. The contract itself states the purpose for which it was entered into: "it is mutually agreed between the several parties of the first part and said second part that he [the administrator] shall disburse the money so now in his hands as well as all other sums of money which may hereafter come into his hands as such *person* representative, to the parties of the first part severally to the end that it will make the amounts so already advanced by said J. M. Boggs and now to be disbursed by second party, as nearly equal as possible among the several parties of the first part." Clearly, with such purpose prompting the execution of this contract there was not and could not be any fraud in the inducement thereof; but this case represents the commonest form of fraud in the factum. Where, as here, the contract was drawn up and signed by the parties under the false belief on the

part of the brothers and sisters ôf H. M. Boggs that he, as they, was fully disclosing in the contract the amount of advancements received by him for the purpose of giving to each an equitable distributive share in the estate of his father, J. M. Boggs. Certainly, the misrepresentation of H. M. Boggs to the effect that he received only $6,100.00 from his father was not in the treaty or in the inducement of the contract: it was part and parcel of the contract itself. Being false and going to the very heart of the contract in contravention of the evident purpose for which it was entered into, the agreement is void because there was not, and could not have been, in view of H. M. Boggs' failure to disclose the amount of the advancements received by him, a meeting of the minds among these twelve children of J. M. Boggs, deceased. There being no meeting of the minds, there was no contract either in law or equity. For after all, "Fraud in the factum" or execution of an instrument, as distinguished from "fraud in the treaty" goes to the issue of *non est factum*. *Furst* v. *Merritt*, 190 N. C. 397, 130 S. E. 40, 17 Corpus Juris Secundum, Contracts, Sec. 153, 12 Am. Jur., Contracts, Section 10.

But the purported agreement of October 26, 1938, although it has no validity as a contract, was properly introduced in evidence, and remains in this case for evidentiary purposes only, that is, as admissions against interest, and as to those admissions all of the parties are bound in the sense that they cannot gainsay that they have, in fact, received the advancements set forth in the purported contracts; and H. M. Boggs is likewise bound as to his representation only to the extent that he received $6,100.00 but, in the light of his misrepresentation, he cannot rely upon the self-serving statement in the purported agreement as to the amount which he received.

As H. M. Boggs cannot use his self-serving statements as to the amount of advancements which he received from his father, J. M. Boggs, to his own advantage, we look to the letter of J. M. Boggs, dated January 4, 1906, to W. R.

Mealy, to determine what, if any, advancements, H. M. Boggs had received prior to that time. This letter states, as heretofore indicated, that "I [decedent] furnished Harry $3150—over and above his advancement of $5000,". The advancement of $5,000.00 concerning which the decedent wrote to W. R. Mealy on January 4, 1906, evidently consisted of the timber, valued in the contract of October 26, 1938, by H. M. Boggs at $3,000.00. While the record is not clear on the question it seems that H. M. Boggs was taking the timber off J. M. Boggs' land about the time the letter was written; and as the value of the advancement is to be determined as of its date, (*Gaylord* v. *Hope Natural Gas Co.*, 122 W. Va. 205, pt. 5 syl., 8 S. E. 2d 189), the amounts set forth in the letter should be taken in preference to the evidently compromise value of $3,000.00 set forth in the agreement, for no one has a better right to determine the value of an advancement at the time it is made than the donor himself. However, from this record, we find that the store charged in the contract at $1,100.00, one-half interest therein being stated in the contract as worth $950.00, was given to H. M. Boggs about 1902 before the letter was written, and was a part of the sum of $3,150.00, concerning which the decedent wrote in the Mealy letter. The homeplace, valued in the contract at $2,000.00, was acquired by H. M. Boggs from his father, J. M. Boggs, according to this record, about the year 1912, and was not considered by decedent in the writing of the Mealy's letter. So, applying the rule in the *Gaylord* case, we find that as of the time the letter of January 4, 1906, was written H. M. Boggs received advancements in the total amount of $8,150.00, which, together with the $2,000.00 value of the homeplace, makes the advancements for which he should be charged $10,150.00.

In addition to the foregoing, counsel for Ed L. Boggs, as administrator, claims that H. M. Boggs should be charged with advancements in the amount of the following checks: September 18, 1917, $500.00; October 2, 1919, $100.00; June 17, 1922, $50.00; February 3, 1925, $100.00;

May 24, 1926, $100.00; February 26, 1916, $81.25; and April 10, 1933, $40.00.

In determining whether the amounts of the foregoing checks constitute advancements, we are prompted to apply the rule stated in point 3 syllabus of the *Gaylord* case: "Where a parent makes a substantial gift of money or property to his child, the same will be presumed to be an advancement, but such presumption may be rebutted by competent proof of facts or circumstances sufficient to establish a different intent on the part of the parent." In this case, as in the *Gaylord* case, the ancestor evidently had in mind his desire that his children should have an equal share in his estate. In the instant case, notwithstanding the contract of October 26, 1938, a greater amount by way of advancements to decedent's children, other than H. M. Boggs, was given to Sabina C. Mealy, J. B. Boggs, Fred Boggs, Dr. A. S. Boggs, and Ella Pembroke than was advanced to decedent's other children. It was his evident intent, as disclosed by this record, initially to make advancements to each of his children in the amount of $5,000.00, and on this basis Ed L. Boggs received $5,000.00, as shown by the contract of October 26, 1938, and the letter of January 4, 1906. In this case, as this Court said in the *Gaylord* case, at page 213 of the opinion: "* * * the rule of law that seeks equality between heirs in cases where advancements are brought into hotchpot, we have no doubt that equity will be served as between these heirs by treating all of the payments * * * in whatever form they may have been made, as advancements." Applying this rule to the consideration of the various checks claimed to have represented advancements, we think that H. M. Boggs, the payee of those checks, should be charged with the amounts thereof, where the payment is unexplained, notwithstanding Code, 46-2-1, (the negotiable instruments law), which reads: "Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration, and every person whose signature appears thereon to have become a party thereto for value."

Of the foregoing checks only three, the one dated September 18, 1917, for $500.00, the one dated February 26, 1916, for $81.25, and the one dated February 3, 1925, for $100.00, in our opinion, should be held under this record to be advancements. The $500.00 check contains the notation to "Pay for Hot Water Apparatus on New Home". H. M. Boggs testified as to this check that: "Well, that check he gave it to me to pay for heating system. I wan't going to put it in and he said to go on and put it in and he would pay for it in the house I built. I don't know whether I should be charged with it or not the way he said he was going to pay for it." This testimony, in our opinion, does not serve to overcome the presumption that the $500.00 payment was, in fact, an advancement. In response to the question: "What do you know about that check [check of $81.25]?", H. M. Boggs testified: "I don't know—that was the time my house burned down." Likewise such testimony does not overcome the prevailing presumption. Concerning the check dated February 3, 1925, for $100.00, H. M. Boggs testified, "I wouldn't say for sure what it was for."

However, H. M. Boggs, with some degree of satisfaction, explains the other checks, the amounts of which are claimed to be advancements. The check of October 2, 1919, for $100.00 was explained on the basis of oil and gas properties jointly leased by J. M. Boggs and H. M. Boggs; the check of June 17, 1922, in the amount of $50.00 was for a steer; as to the check of May 24, 1926, for $100.00, the witness testified, rather unsatisfactorily, but, in our opinion, in a way satisfactory to overcome the presumption of advancement that "he [J. M. Boggs] gave me checks along for something I would do for him"; concerning the check of April 10, 1933, in the amount of $40.00, the witness testified that it was spent in a shopping trip in Charleston for decedent.

So we think that H. M. Boggs should be charged with advancements as follows: $8,150.00, as set forth in the Mealy' letter; $2,000.00 representing the homeplace ac-

quired in 1912; $500.00, the amount paid for the heating system; the $81.25 check given when H. M. Boggs' house burned; and the check for $100.00, making a total of $10,831.25, with interest from decedent's death, on March 28, 1934. Pt. 6 Syl., *Gaylord* v. *Hope Natural Gas Co.*, *supra*, reads: "Interest on any advancement made to a child or prospective heir or distributee will not be charged until the death of the donor; but, in order to bring about equality as between those entitled to share in the distribution of an estate, interest should be charged on an advancement from and after the death of the donor thereof."

Counsel for appellee, H. M. Boggs, however, pose the question whether Ed L. Boggs, individually and as administrator of the estate of J. M. Boggs, deceased, is estopped by the record in the case of *Ed L. Boggs, et al.* v. *Harry M. Boggs, et al.*, No. 9420, 125 W. Va. 600, 25 S. E. 2d 631. In that case, all of decedent's children and their respective wives and husbands, having executed a deed of trust, dated August 3, 1939, purporting to convey to Russell Y. Boggs and Earl L. Boggs, trustees, all of grantors' interest in the real estate of which J. M. Boggs died seized and possessed, the trust being for the benefit of the grantors, said trustees, together with all of the children of J. M. Boggs, deceased, with the exception of H. M. Boggs, brought suit in equity against H. M. Boggs and Della Boggs, his wife, for the purpose of charging with a trust in favor of the grantors in said deed of trust, two tracts of land in Braxton County conveyed by J. M. Boggs and Lidie D. Boggs, his wife, to H. M. Boggs, by deed dated February 2, 1933. The contract between all the children of J. M. Boggs, deceased, and Ed L. Boggs, administrator, dated October 26, 1938, was introduced in evidence in the equity suit; and it is on the basis of the introduction of that contract and Ed L. Boggs' testimony in reference thereto, adduced in the former case, that counsel for H. M. Boggs now takes the position that Ed L. Boggs, as administrator and individually, is estopped from assuming in the instant case what counsel say is a position inconsistent with that taken in the former case.

The cases of *MacDonald* v. *Long,* 100 W. Va. 551, 131 S. E. 252; *Town of Weston* v. *Ralston,* 48 W. Va. 170, 36 S. E. 446, and other authorities are cited for the rule prevailing in this jurisdiction that a party is estopped from assuming successive and inconsistent positions in the course of a suit or a series of suits in reference to the same matters. In the record immediately under appraisment, Ed L. Boggs testified that "When I come to Harry's I put the value of $2,000 on his land, and three thousand for a piece of timber that was worth a great deal more." He later testified that he charged Harry in the contract for the timber in the amount of $3,000.00 but "the real value of the timber was a great deal more, in my judgment." Evidently, however, Ed L. Boggs did not rely in the former suit upon the contract of October 26, 1938, because on page 320 of the printed record in the case of *Boggs* v. *Boggs, supra,* the plaintiff introduced in evidence the letter of January 4, 1906, which contained the language "and I furnished Harry $3150.—over and above his advancement of $5000." So to a large extent in this proceeding the administrator is taking the same position which he, as such administrator and individually, assumed in the former suit. We, therefore, are of the opinion that there is no estoppel.

As to the item of $1,233.84, the amount of interest on the $2,000.00 indebtedness, less court costs in the case of *Boggs* v. *Boggs, supra,* the amount charged represents an indebtedness due the estate of J. M. Boggs, deceased, and should not be regarded as an advancement, but as an indebtedness which should be paid in any event. An indebtedness against an estate, as distinguished from an advancement against the estate, is decidedly different. An indebtedness must be paid in any event: an advancement, under the opinion of this Court in the case of *Gaylord* v. *Hope Natural Gas Co., supra,* pt. 8 syl., embraces no obligation to repay the amount thereof.

The contract of October 26, 1938, provides that A. S. Boggs received an advancement of land and money of

$6,800.00. The Circuit Court of Clay County, notwithstanding the factual finding of the commissioner of accounts and the representation contained in the contract of October 26, 1938, reduced the amount of $6,800.00, as the advancement of A. S. Boggs, to $5,200.00, simply because, as this record discloses, that was the amount agreed on after the execution of the contract by A. S. Boggs and the administrator. A. S. Boggs' admission against interest in the contract of October 26, 1938, in our opinion, should prevail over the purported settlement as disclosed by the record.

We, therefore, find that the twelve distributees have received advancements as follows: Sabina C. Mealy, $5,200.00; Mary S. Hyer, $4,500.00; J. B. Boggs, $7,000.00; Guy Boggs, $4,000.00; Katie Ball, $4,000.00; Fred Boggs, $6,500.00; Ed L. Boggs, $5,000.00; E. A. Boggs, $3,000.00; A. S. Boggs, $6,800.00; Ella Pembroke, $11,000.00; C. A. Boggs, $3,000.00; and Harry M. Boggs, $10,831.25. The amount of $10,831.25, received by H. M. Boggs by way of advancements is in addition to his indebtedness for interest in the amount of $1,233.84. So adopting the language of the final order of June 6, 1949, we hold that "the disbursements of the administrator of all available funds, in his hands, or to later come into his hands, shall be made in such manner as to equalize the inheritance of the several heirs, having regard to the dates and amounts of the advancements and payments heretofore made by the administrator to the several heirs and the interest accruing thereon, and on the basis of the principles of this decree." And in making distribution in the future, the administrator should apply the rule prescribed in point 8 of the syllabus of the case of *Gaylord* v. *Hope Natural Gas Company, supra,* which reads: "Under Code, 42-4-1, an heir or distributee who has received from his parent or ancestor money or property as an advancement, must, as a prerequisite to further participation in the estate of such parent or ancestor, bring into hotchpot the money or property so received."

The final question before this Court is whether the cir-

cuit court erred in disallowing Ed L. Boggs commissions in the amount of $3,764.76, consisting of the items of $2,500.00 and $1,264.76. No objection was made to the allowance of commissions in the amount of $1,264.76. The commissioner of accounts allowed both items of commissions in the amount of $3,764.76, saying that "Ed L. Boggs has done service, has done it well, his charge is moderate considering the trouble and anxiety he has experienced, and this commissioner has no compunctions in allowing him" the commissions charged. The county court affirmed the commissioner's report as to the allowance of commissions. In this regard it is contended that under Code, 44-4-9, because Ed L. Boggs failed to account, as provided in Section 9, he has forfeited his commissions. But Section 9 provides for the forfeiture of commissions upon failure to effect settlements of account "unless allowed by the court." Under Section 24, Article VIII, of the Constitution, county courts have original jurisdiction "in all matters of probate, the appointment and qualification of personal representatives, guardians, committees, curators, and the settlement of their accounts, * * *". Section 24 gives jurisdiction to county courts in the entire field of the settlement of estates, and Code, 44-4-9, gives discretion to county courts, where there has been a failure of a fiduciary to make settlement, as required by statute, to award commissions, notwithstanding the fiduciary's failure to account, as required by law.

The County Court of Clay County, having the discretion and power to award commissions, and, having exercised that power in a case in which it clearly appears that the administrator of the estate of J. M. Boggs, deceased, has rendered a real service to the estate of his father in behalf of his brothers and sisters, this Court cannot say that there was an abuse of such discretion; and, further, because the discretionary power lies in the county court, the Circuit Court of Clay County has no power, unless it clearly appears from the record that there was an abuse of discretion on the part of the county court, to disallow such commissions. For this reason this Court is of opin-

ion that on the question of commissions to the administrator, the County Court of Clay County has primary jurisdiction under Section 24 of Article VIII of the Constitution to decide the question of commissions, and, having so decided, its finding in that regard should not be disturbed either in this Court or in the Circuit Court of Clay County.

We therefore reverse the order of the Circuit Court of Clay County, entered on June 6, 1949, and the order of the county court of that county, entered on December 6, 1948, and remand this case for the entry of an order by the Circuit Court of Clay County consonant with the holdings herein set forth.

*Reversed and remanded with directions.*